[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15322

_____

D.C. Docket No. 1:11-cr-20100-PAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARK WILLNER, M.D.,
ALBERTO AYALA, M.D.,
VANJA ABREU, Ph.D., and
HILARIO MORRIS a/k/a Larry Morris,

Defendants-Appellants.

**CONSOLIDATED WITH**

_____

No. 13-10533

_____

D.C. Docket No. 1:11-cr-20100-PAS-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LYDIA WARD, PH.D.,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(August 3, 2015)

Before TJOFLAT, JILL PRYOR, and COX, Circuit Judges.

COX, Circuit Judge:

We have consolidated these two cases because we address two trials involving the same indictment and the same Medicare fraud conspiracy charges. In *United States v. Mark Willner, M.D., Alberto Ayala, M.D., Vanja Abreu, Ph.D., and Hilario "Larry" Morris*, Case No. 12-15322, the Defendants appeal their judgments of conviction resulting from the first trial. In *United States v. Lydia Ward, Ph.D.*, Case No. 13-10533, the Defendant Dr. Ward appeals her judgment of conviction resulting from the second trial. We will address the first trial, and then the second. We affirm in part and reverse in part.

## I.  Introduction (Applicable to Both Cases)

Count 1 of the indictment (Doc. 26) references 18 U.S.C. § 1349, a conspiracy statute, and alleges that all of the Defendants in these two cases

2

conspired to violate 18 U.S.C. § 1347, the health care fraud statute.  Count 13 of the indictment is an additional charge against the Defendant Morris.  Count 13 references 18 U.S.C. § 371, another conspiracy statute, and alleges that the Defendant Morris conspired to violate 42 U.S.C. § 1320a-7b(b)(1)(A) and (2)(A), the health care fraud anti-kickback statute.

The Count 1 conspiracy charge alleges that the Defendants, while employed by or under contract with American Therapeutic Corporation ("American Therapeutic"), conspired with others to violate 18 U.S.C. § 1347 by submitting to Medicare on behalf of American Therapeutic and its corporate sister, American Sleep Institute ("American Sleep"), fraudulent claims for partial hospitalization services and diagnostic sleep studies.  The Count 13 conspiracy charge alleges that the Defendant Morris violated 42 U.S.C. § 1320a-7b(b)(1)(A) and (2)(A) by paying or offering to pay patient brokers and referral sources to send patients to American Therapeutic.  And, the indictment alleges that the amount of the claims submitted by these companies between December 2002 and when the FBI closed them in October 2010 exceeded $ 200 million.[1]

At the first of these two trials, the jury found Dr. Abreu, Dr. Ayala, and Dr. Willner guilty of the Count 1 conspiracy charge, and found Morris guilty of the

---

[1] Throughout this opinion, we refer to as "Dr." both the medical doctors, Dr. Ayala and Dr. Willner, and the Ph.D.'s, Dr. Abreu and Dr. Ward.

3

Count 13 conspiracy charge. The jury could not agree as to Morris or Dr. Ward on the Count 1 conspiracy charge.[2] The district court sentenced Dr. Ayala and Dr. Willner each to ten years imprisonment. The district court sentenced Dr. Abreu to nine years imprisonment, and Morris to five years imprisonment. Morris and Dr. Ward were retried in the second trial on the Count 1 conspiracy charge. Dr. Ward was found guilty. The jury could not agree as to Morris, and the Government dismissed Count 1 against him. The district court sentenced Dr. Ward to ninety-nine months imprisonment.

Dr. Abreu moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The only charge against Dr. Abreu is the Count 1 conspiracy charge. Dr. Abreu is also the only Defendant who challenges the sufficiency of the evidence to sustain her conviction. We will discuss facts relevant to this issue in Section IV.A.

We reverse Dr. Abreu's conviction because we conclude that the district court erred in denying her motion for judgment of acquittal on the Count 1 conspiracy charge. We affirm the convictions of all other Defendants in both cases because we find no reversible error.

---

[2] The indictment also charges Dr. Ayala and Dr. Willner with several substantive violations of 18 U.S.C. § 1347. They were acquitted of these charges.

## II.  Medicare Coverage of Partial Hospitalization Services
### (Applicable to Both Cases)

Before discussing the facts of these cases, we begin with a discussion of the law of Medicare-covered partial hospitalization programs.  Medicare is the federally funded health and disability insurance program for the aged and disabled. 42 U.S.C. §§ 1395–1395kkk-1.  Medicare provides benefits for partial hospitalization "items and services" delivered by community mental health centers using the community mental health centers' partial hospitalization programs. *Id.* § 1395x(ff)(3).  Partial hospitalization services generally are defined by statute as "items and services . . . prescribed by a physician and provided under a [partial hospitalization program]." *Id.* § 1395x(ff)(1).  Section 1395x(ff)(2) lists the covered "items and services."  The general statutory definition of a partial hospitalization program is, for our purposes, "a program which is furnished . . . by a community mental health center . . . which is a distinct and organized intensive ambulatory treatment service offering less than 24–hour-daily care other than in an individual's home or in an inpatient or residential setting." *Id.* § 1395x(ff)(3)(A).

To be covered by Medicare, partial hospitalization services must be prescribed by and delivered under the supervision of a physician.  The services must comply with a written, individualized treatment plan established and periodically reviewed by a physician in consultation with appropriate staff. *Id.* §

5

1395x(ff)(1). [3] The treatment plan must include the physician's diagnosis, and the means of and duration for treating the patient. 42 C.F.R. § 424.24(e)(2)(i)–(ii). The items and services prescribed must be "reasonable and necessary for the diagnosis or active treatment of the individual's condition, reasonably expected to improve or maintain the individual's condition and functional level and to prevent relapse or hospitalization." 42 U.S.C. § 1395x(ff)(2); *see* 42 C.F.R. § 410.43(a)(1)–(2) (same); *see also* 42 U.S.C. § 1395y(a)(1)(A) (no payment made for items and services "not reasonable and necessary for the diagnosis or treatment of illness"). The treating physician must certify that, if the partial hospitalization program were not available, the patient would require inpatient care; that the physician has established and is reviewing the treatment plan periodically; and that the physician is treating the patient. 42 U.S.C. § 1395n(a)(2)(F). A physician's recertification of the patient's progress must occur no later than eighteen days after the patient's admission to the partial hospitalization program and no later than every thirty days thereafter until discharge. 42 C.F.R. § 424.24(e)(3)(i)–(iii).

Medicare contracts with local intermediaries to process and pay claims. 42 U.S.C. § 1395kk-1(a)(1). First Coast Service Options, Inc. ("First Coast"), under contract with Medicare, *see id.* § 1395kk-1(a)(4)(A)–(B), was the intermediary that

---

[3] Medicare will cover partial hospitalization services rendered by physician's assistants, *see* 42 C.F.R. § 410.74, and nurse practitioners, *see id.*, § 410.75, if strict regulatory guidelines are met.

processed and paid claims submitted by American Therapeutic and American Sleep. First Coast used its local coverage determination to process and pay claims. A local coverage determination is a document published by an intermediary, such as First Coast, detailing the categories of items and services for which Medicare will pay, such as partial hospitalization services, if the requirements of the local coverage determination are met. "The majority of the language contained in the [local coverage determination] . . . is derived from the Code of Federal Regulations." (Doc. 1386:55).

The Government's expert, Dr. Marvin Herz, testified that psychiatrists are ultimately responsible for any patient for whom they are the attending physician. They should not sign patient records indicating that they have seen patients whom, in fact, they have not seen. Candidates for partial hospitalization are individuals with serious and acutely symptomatic mental illnesses who would require inpatient hospitalization if partial hospitalization were not available. The symptoms, and not the illness itself, determine suitability for partial hospitalization. The patient's condition must satisfy the criteria for admission and yet not prevent the patient from participating in the treatment and therapy process. Dr. Herz also testified that individuals with serious mental illnesses are not candidates for diagnostic sleep studies because their underlying illnesses or the medications they are taking for their illnesses already impede their sleep patterns.

7

*United States v. Mark Willner, M.D., Alberto Ayala, M.D., Vanja Dr. Abreu, Ph.D, and Hilario "Larry" Morris*, Case No. 12-15322

---

### III.  Facts as to the Fraudulent Scheme

The American Therapeutic/American Sleep Medicare fraud scheme was straightforward: First, pay Medicare-enrolled individuals, directly or through referral sources, to come to American Therapeutic for partial hospitalization services, even though the individuals were not eligible for partial hospitalization services.  Second, keep the patients for as long as possible and occupy them with superficial therapy that did not constitute partial hospitalization services. Occasionally, prescribe American Sleep diagnostic sleep studies for American Therapeutic patients, even though the patients were ineligible for and did not need the sleep studies. Third, discharge the patients, calendar them for readmission as soon as allowed by the Medicare rules, and then bill Medicare.  Finally, create patient files to have on hand in the event of Medicare audits.  The files portrayed the individuals as having been eligible for partial hospitalization services upon admission and as having received partial hospitalization services during their stays. In fact, a principal architect of the fraudulent scheme testified that very few patients were eligible upon admission and fewer still received appropriate services.

Larry Duran ("Duran"), Marianella "Mary" Valera ("Valera"), and Judith Negron ("Negron") devised, implemented, and were responsible at the highest

8

level for the fraud by American Therapeutic and American Sleep.[4]  These three owned and operated American Therapeutic, American Sleep, and a third company, Medlink Professional Services Group, Inc. ("Medlink").  In seven of its eight community mental health centers, American Therapeutic ostensibly provided partial hospital services.  At its one facility, American Sleep ostensibly provided diagnostic sleep studies.  Medlink's ostensible purpose was to provide administrative management for American Therapeutic and American Sleep.

## A.  The Kickback Operation

In reality, Medlink was the hub of the kickback operation.  American Therapeutic and American Sleep paid a $ 20,000 per month-per facility fee to Medlink that Medlink used to fund kickbacks.  Medlink used "Behavioral Health Promoters" (e.g., the Defendant Morris) to deliver cash in envelopes to a network of referral sources Duran had developed in exchange for their referring patients to American Therapeutic.  These referral sources included assisted living facilities and halfway houses.  Medlink also provided money to "patient brokers," individuals who directly approached partial hospitalization prospects and paid them to participate in American Therapeutic's program.  At the height of the fraud, Medlink was paying hundreds of thousands of dollars monthly to patient provider sources.

---

[4] Duran, Valera, and Negron were indicted in another case.  Duran and Valera pleaded guilty; Negron was found guilty by a jury after trial.

Maggie Acevedo, whom Medlink hired in 2005, was the individual responsible for running the kickback operation. Hers was a full-time job.[5] She negotiated rates and tallied amounts owed to referral sources using monthly Medicare billing summaries and master patient logs. She then obtained the necessary cash from Duran and the shell companies beneath the Medlink umbrella and put the cash into envelopes for delivery to the referral sources. Occasionally, Acevedo mediated disputes with referral sources that believed they had been "shorted." In this phase of the conspiracy, the Defendant Morris did everything from helping Acevedo stuff envelopes with cash to mediating disputes with disgruntled referral sources. At one point, the Defendant Dr. Ayala himself was receiving cash for his own patients referred to American Therapeutic. And, Dr. Ayala was advertising the program to an assisted living facility owner and inquiring to be sure that the owner had been paid.

## B. The Clinical Operation

The clinical side of the fraudulent operation was run by psychiatrists like Dr. Ayala and Dr. Willner (Defendants), and Dr. Alan Gumer.[6] Dr. Willner worked at American Therapeutic from August 2007 to October 2010. A Patient Broker, Mathis Moore, recruited Dr. Willner to work for American Therapeutic. Moore

---

[5] Acevedo was indicted with Duran, Valera, and Negron. She pleaded guilty.

[6] Dr. Gumer pleaded guilty in this case and testified for the Government.

10

ran substance abuse centers and made money by sending his clients to American Therapeutic. It was a precondition of a client's admission to one of Moore's facilities that the client have Medicare coverage and attend American Therapeutic's program. If the client did not have Medicare, Moore would not allow them to stay more than a few days.

Moore occasionally needed to send his clients to local hospitals, which is how he met Dr. Willner. Dr. Willner agreed to help Moore avoid "poaching" of Moore's clients by ensuring their return to Moore's facilities. Dr. Willner also made sure that Moore's clients had discharge papers that would facilitate Moore's getting the patients back to American Therapeutic. Dr. Willner also would give Moore a "heads up" if it appeared that one of Moore's clients was on the verge of being discharged to another substance abuse center. Later in the relationship between Moore and Dr. Willner, Dr. Willner wrote several dozen blank sleep-study prescriptions, knowing that Moore would use them to get paid for sending his clients to American Sleep. This was necessary because Duran had told Moore that the doctors at American Therapeutic would no longer write sleep-study prescriptions. Before Dr. Willner went to work for American Therapeutic, Moore told him that American Therapeutic paid its referral sources for American Therapeutic patients. After beginning his work at American Therapeutic, Dr.

11

Willner soon worked his way into the "circle of trust" and spent time socially with Duran, Valera, and Negron.

Dr. Ayala began with American Therapeutic in 2003. He resigned under pressure in September 2008 after a Program Director threatened legal action against and obtained a settlement from American Therapeutic because Dr. Ayala had signed and dated charts representing that he had admitted and attended to ineligible partial hospitalization service patients when, in fact, he had been out of the country. Dr. Ayala developed a relationship with an assisted living facility owner, telling him that American Therapeutic would pay for patients, and following up with code words for cash (e.g., apples, prescriptions) to make sure that the owner got his money. At Valera's direction, Acevedo once made a cash payment directly to Dr. Ayala for patients he had referred from an assisted living facility. Acevedo had noticed that two facilities were missing from her master patient log that she used to compute kickbacks, and then learned that the referrals were from Dr. Ayala himself. Acevedo delivered the cash-filled envelope to Dr. Ayala in a records room. Acevedo knew the envelope contained cash because she had packed hundreds of envelopes with kickback cash.

When their contracts began, Valera told Dr. Ayala and Dr. Willner that they would be working approximately twenty hours per week. In fact, they worked between two and three hours per-week per-facility to which they were assigned,

12

signing documents in patient charts representing that they had performed diagnostic, treatment-related, and prognostic work that they had not performed. Dr. Willner signed treatment plans certifying that he had prepared them; he had not. He signed recertifications signifying that the patients were still in need of partial hospitalization services, when, in fact, Valera predetermined how long patients stayed. The sole criterion used to determine whether a patient should remain in the program was whether he or she was at or near maximum Medicare benefit. Dr. Willner did not participate in very intensive treatment, and he had nothing to do with determining patient discharge. Dr. Willner signed patient charts on the days that he would come in as fast as the medical records clerk could flip through the pages.

Dr. Ayala's clinical work was similar. Valera or a clerk would flip through open and closed charts as fast as Dr. Ayala could sign the two to five lines per chart that required signatures. Occasionally, if he saw something like a medication discrepancy, he would not discuss the issue with the patient; he simply would notify the owner of the assisted living facility where the patient lived. Dr. Ayala did not review therapist notes and did not meet with the treatment team to discuss patient progress. He took no part in the preparation of treatment plans, and he signed recertification orders without any clinical input into their content. Recertification and discharge were scheduled by Valera. Dr. Ayala's physician's

13

assistant initially did not sign charts, even though he saw the patients. At the end, he was evaluating patients as they were getting in five, fifteen-seat vans and leaving, spending perhaps five minutes per van. Valera more than once discussed the assistant's cookie-cutter notes with Dr. Ayala, and Dr. Ayala knew that Valera was altering the assistant's notes to make the patients appear eligible for partial hospitalization services.

Dr. Ayala and Dr. Willner were routinely signing charts signifying that they had seen patients when they had not. At best, one of their medical extenders had treated the patient, but the doctors knew nothing about the treatment.[7] Often, the medical extenders, themselves, were not even seeing the patients.

Dr. Willner was responsible for $ 70.4 million in American Therapeutic's Medicare billings from October 2007 through September 2010. This figure nearly equaled the billings of the other thirty-nine American Therapeutic physicians. Dr. Ayala was responsible for $ 38.5 million in American Therapeutic Medicare billings from May 2004 through his resignation in September 2008. For their work—two to three hours per-week per-facility—Dr. Willner was paid $ 641,000; Dr. Ayala, $ 586,340. American Therapeutic billed Medicare for a total of $ 199.4 million and received from Medicare $ 85.7 million. American Sleep, which

---

[7] "Medical extenders" are non-physician, licensed medical professionals. The medical extenders Dr. Willner used at American Therapeutic were advanced registered nurse practitioners. The medical extenders Dr. Ayala used were physician's assistants.

opened in 2005 and closed in 2009, billed Medicare for a total of $ 5.8 million and received from Medicare $ 1.8 million.

## IV.  Discussion

### A.  The Sufficiency of the Evidence Issue as to Dr. Abreu

We now turn to consider the sufficiency of the evidence as to Dr. Abreu. American Therapeutic hired Dr. Abreu in September 2005 as a salaried Program Director.  She was promoted to Corporate Director of Utilization Review and Performance Management for a period of months, and finished with American Therapeutic as an acting Program Director.  American Therapeutic never paid her anything but her $ 66,400 annual salary.

As Program Director, Dr. Abreu was responsible for all clinical and operational aspects of the community mental health center for which she was in charge.  She had to know the local coverage determination thoroughly, ensure that documentation by her staff met Medicare protocols, review records regularly, and train clinicians to document properly.  Although she was not responsible for billing, she had to ensure that those who were responsible received from her center the necessary data and information.  As Corporate Director, a position she held for seventeen months, Dr. Abreu supervised all Program Directors, trained clinicians regarding proper Medicare documentation, performed regular mock audits, and generally was responsible for Medicare-protocol compliance.

15

The grand jury indicted Dr. Abreu only on the Count 1 conspiracy charge. The indictment charges that Dr. Abreu was a member of the conspiracy to violate 18 U.S.C. § 1347. Section 1347 forbids "knowingly and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347. Medicare is a "health care benefit program." *Id.* § 24(b). The indictment contains only one specific allegation describing Dr. Abreu's contribution to the conspiracy: she "cause[d] the alteration of patient files, as well as therapist notes maintained in [American Therapeutic's] computer system, for the purpose of making it falsely appear that patients being treated by [American Therapeutic] qualified for [partial hospitalization program] treatments." (Doc. 26 at 10, ¶ 10). The district court, following the Eleventh Circuit's pattern instructions, correctly charged the jury that the Government had to prove beyond a reasonable doubt that (1) Dr. Abreu actually knew the unlawful purpose of the conspiracy, and (2) willfully joined the conspiracy. And, the district court instructed the jury that simply performing tasks that unwittingly advance the purpose of a conspiracy does not make one a co-conspirator. The Government does not contend that Dr. Abreu was subject to

16

conviction for aiding and abetting under 18 U.S.C. § 2.[8]   The district court did not give the jury an aiding and abetting instruction with respect to the Count I conspiracy charge.

Dr. Abreu contends that the district court erred in denying her Rule 29 motion for judgment of acquittal because there was insufficient evidence from which any reasonable juror could find that Dr. Abreu was guilty beyond a reasonable doubt of knowing that a criminal conspiracy existed and of willfully joining it.   More particularly, Dr. Abreu contends that the Government's two theories of her guilt—that she falsified patient files and admitted ineligible patients in the psychiatrists' absence—are not supported by the record. Rule 29(a) requires the district court, on its own or on the defendant's motion after the close of the government's evidence, or after the close of all the evidence, to enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).   Rule 29(c)(1) allows a defendant to renew that motion within fourteen days of a guilty verdict.  Dr. Abreu did both.

The Government counters that the evidence was sufficient to sustain Dr. Abreu's conviction.  More particularly, the Government contends that there was evidence from which the jury could infer that Dr. Abreu altered charts to create an

---

[8] This section reads: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.  (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  18 U.S.C. § 2.

17

appearance that patients Dr. Abreu actually knew to be ineligible for partial hospitalization services were, in fact, eligible and were receiving treatment that Dr. Abreu actually knew they were not receiving. The Government contends that Dr. Abreu trained staff about how to admit cognitively impaired patients who were ineligible for partial hospitalization services. And, the Government also contends that other evidence supports beyond a reasonable doubt Dr. Abreu's knowledge of and joining in the conspiracy.

We review de novo Dr. Abreu's contention that the district court erroneously denied her Rule 29 motion. *United States v. Medina*, 485 F.3d 1291, 1296 (11th Cir. 2007). We resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict and ask whether any reasonable juror could have found Dr. Abreu guilty beyond a reasonable doubt. *Id.* at 1296–97. "If there is a lack of substantial evidence, viewed in the Government's favor, from which a reasonable factfinder could find guilt beyond a reasonable doubt, the conviction must be reversed." *Unites States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989).

We begin by noting that there is no direct evidence that Dr. Abreu actually knew of or joined in the conspiracy. In fact, there is no direct evidence supporting any of the Government's contentions. No witness testified that he or she told Dr. Abreu about the conspiracy or witnessed someone else doing so. No witness testified that Dr. Abreu joined the conspiracy. There are no documents in the

18

record that Dr. Abreu allegedly falsified.  No clinician testified that he or she told Dr. Abreu of progress notes having been altered.  There is no direct evidence that Dr. Abreu forged anyone's signature or saw someone else do so.  There is no direct evidence that Dr. Abreu admitted an ineligible patient.  Finally, there is no evidence that Dr. Abreu ever sent a document to Medicare or signed a document that someone else sent to Medicare.  The Government defends Dr. Abreu's conviction entirely on the basis of circumstantial evidence. (Brief of the United States at 66).  For the guilty verdict against Dr. Abreu to stand, a reasonable juror must be able to infer from the evidence that Dr. Abreu knew of the conspiracy and that she willfully joined it.[9]

The Government contends that evidence of Dr. Abreu's guilt includes circumstantial evidence that she falsified charts to make ineligible partial hospitalization patients look eligible and to make it appear that they had received partial hospitalization services mandated by the statutes, regulations, and the local coverage determination.  There is evidence that, as part of her job, Dr. Abreu altered and completed patient files to make them Medicare-compliant.  Most of this work occurred during mock audits, but Dr. Abreu was responsible for Medicare-

---

[9] Valera testified that she thought almost all of the patients were ineligible for partial hospitalization services and thought almost none of the patients received full partial hospitalization services.  Valera knew through Duran and Acevedo that the patients were paid to be at American Therapeutic and American Sleep.  We are not convinced that any reasonable juror could find beyond a reasonable doubt, however, that Dr. Abreu directly or indirectly knew any of this simply because she worked closely with Valera on charts and staff training.

19

guideline compliance at all times.[10]  When deficiencies were noted, Valera told Dr. Abreu to train the staff not to make the same mistakes again.  No evidence supports an inference beyond a reasonable doubt that Valera directed Dr. Abreu to train the staff to correct deficiencies by falsifying patient records.[11]  No reasonable juror could find beyond a reasonable doubt that Dr. Abreu falsified charts at all, whether by misrepresenting what she knew about the patients or what anyone else had told her about the patients.[12]

The rest of the inferences that the Government suggests about Dr. Abreu and patient paperwork are weaker still.  The Government implies that Dr. Abreu urged Dr. Gumer to complete dictations for patients who had left and to backdate admissions forms.  "[A]round the time of inspection," Dr. Gumer testified, "I

---

[10] A Behavioral Health Promoter testified and was asked whether he had an "understanding" concerning what changes Dr. Abreu was making to notes.  He simply observed that she made changes necessary "to meet Medicare guidelines" and to "be above Medicare standards in case there was an audit." (Doc. 1409:41–42).

[11] The Government relies on Valera's testimony that she told Dr. Abreu to train the staff to "paint the picture" regarding the severity of the patient's condition. (Doc. 1381:125).  The Government twisted Valera's testimony out of context at trial and continues to do so here.  Valera testified that she told Dr. Abreu to train the staff to describe in detail what the patients' presenting symptoms were.  Valera used "paint the picture" as a metaphor for "describe," not "falsify."

[12] Valera testified that she also discussed with Dr. Abreu the insufficiency of "precipitating factors" descriptions in the patients' charts.  Precipitating factors are the events that necessitate a patient's partial hospitalization.  Valera's conclusion was that Dr. Abreu needed to train the clinicians to be aware of this aspect of proper charting.  There is no evidence that Valera told Dr. Abreu to train the staff to make up precipitating factors that did not exist, or that Dr. Abreu did so.

needed to catch up . . . ." (Doc. 984:138).  "Catching up" included completing dictations and other documentation.  Dr. Gumer testified that he did not remember Dr. Abreu telling him what to write in the charts he had to complete.  The backdating of admissions forms was Dr. Gumer's "understanding" of what Dr. Abreu was telling him to do.  This evidence does not support an inference that Dr. Abreu altered charts by falsifying them or that she knew that anyone else was altering charts by falsifying them.

Also unpersuasive is the argument that Dr. Abreu knew of and participated in forgeries of patients' and physicians' signatures.  The Government implies that Dr. Abreu told a records clerk to forge patients' signatures on charts.  The Government grounds this implication in Valera's testimony that Dr. Abreu asked the clerk to "do a couple of charts for me." (Doc. 1381:158).  We conclude from our review of the evidence related to this argument that no reasonable juror could find beyond a reasonable doubt that Dr. Abreu directed a records clerk to forge patient signatures in charts.  Similarly, Dr. Abreu's leaving red-flagged charts with Valera and Negron and picking them up later without red flags does not prove that Dr. Abreu actually knew Valera and Negron had forged doctors' signatures in the charts.  Even if Dr. Abreu drew that inference, the Government directs us to no evidence that Dr. Abreu knew why they had done so or whether the information in the charts was false.

A key component of the Government's case was that Dr. Ayala and Dr. Willner signed scores of patients' charts without reviewing them and without having treated the patients. The Government implies that Dr. Abreu witnessed this and knew that the patients were ineligible for partial hospitalization and did not get partial hospitalization services. There is evidence that Dr. Abreu knew that Dr. Gumer, not Dr. Ayala or Dr. Willner, was signing stacks of charts without reading them, but this evidence does not support an inference that Dr. Abreu knew that the patients were ineligible, that they had not received partial hospitalization services, or that Dr. Gumer had not treated the patients. This evidence does not prove that Dr. Abreu knew that "blitz" chart signing by the American Therapeutic psychiatrists was part of the conspiracy.

The Government's contention that Dr. Abreu knew of the conspiracy because she admitted or participated in the admission of ineligible patients focuses on elderly, cognitively impaired patients. There is evidence that Dr. Abreu and Valera discussed how long cognitively impaired patients should stay, and that Medicare was shortening lengths of stay that it would approve. Valera's concern was that Medicare was shortening treatment periods generally; Medicare's decision did not target American Therapeutic. (Doc. 1381:176–81; GEX 69). As for "questionable patients," meaning those patients whose cognitive impairment might make them unsuitable for partial hospitalization services, Valera and Dr. Abreu

22

reviewed several times annually how to interview these patients. They also discussed whether a "short-stay" (two weeks or less) was appropriate for these patients, or whether American Therapeutic simply should turn them away. At worst, this evidence regarding admission of elderly patients demonstrates that Dr. Abreu might have made poor admission decisions on occasion. The Government does not tie this evidence to Dr. Abreu's alleged role in the conspiracy. And, as the district court instructed the jury, "[e]vidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent." (Doc. 1428:112).

The Government contends that two other pieces of evidence prove her knowledge of the conspiracy. The Government argues that Dr. Abreu facilitated American Therapeutic's billing Medicare for therapy services that were not rendered because Dr. Abreu knew patients had not attended full therapy sessions. Claims for group therapy services rendered may not be made for any patient who does not attend a full session. Therapists reported to Dr. Abreu that a particular driver arrived late with his patients. Valera testified that Dr. Abreu told Valera about this situation and that Dr. Abreu offered to see if the therapists would prepare notes for the patients. Valera testified that Dr. Abreu later told Valera that "it was taken care of." (Doc. 1382:13). The record reflects that Valera billed for these sessions, and that Valera discussed the attendance issue with Dr. Abreu only "in general" and only a few times. (*Id.*). This evidence does not support the jury's

23

verdict.  Finally, the Government proffers Dr. Abreu's second-hand awareness of money squabbles between patients.  Dr. Abreu learned of this problem from therapists and reported what she had been told to Valera.  Valera asked her to talk to Duran.  This is the extent of the Government's evidence on this point.  No evidence was offered that the money discussed was kickback money or, if it was, that Dr. Abreu knew it was kickback money.  No evidence was offered about what Dr. Abreu, Valera, or Duran said about it beyond Valera's asking Dr. Abreu to tell Duran.

We hold that the district court erred by failing to grant Dr. Abreu's Rule 29 motion for judgment of acquittal.  We conclude that no reasonable juror could find beyond a reasonable doubt that Dr. Abreu falsified patient eligibility records as alleged in the indictment.[13]  There is some evidence that Dr. Abreu should have known about the conspiracy, but the Government did not prosecute her on that theory.  Even if Dr. Abreu knew of the conspiracy, there is no evidence in the record proffered to us by the Government that Dr. Abreu willfully joined and participated in it.  There is no evidence that she gained anything from the conspiracy.  We reverse her conviction, vacate her sentence, and remand to the district court with instructions that it enter a judgment of acquittal.

---

[13] The indictment alleges generally that all the indictees transferred ill-gotten gains to Medlink's shell corporations and themselves, and that everyone submitted false claims to Medicare. (Doc. 26 at 11, ¶ ¶ 17–18).  No evidence tends to suggest that Dr. Abreu had anything to do with these activities.

24

## B.  Dr. Ayala and Dr. Willner

Dr. Ayala and Dr. Willner each contend that the district court erred in admitting certain testimony, in excluding certain testimony, in refusing to give jury instructions, and in giving a particular instruction.

### 1.  *The Florida-Law Jury Instructions*

Dr. Ayala and Dr. Willner contend that the district court erred by refusing to give their requested theory-of-defense instructions on the use of medical extenders under Florida law.  Dr. Willner sought an instruction that Florida law allowed him to use advanced registered nurse practitioners.  Dr. Ayala sought an instruction that Florida law allowed him to use physician's assistants.  The Government contends that these instructions were "irrelevant," and the district court agreed.

We review for an abuse of discretion a district court's refusal to give requested theory-of-defense jury instructions. *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008).  With respect to a theory-of-defense instruction, a district court abuses its discretion by refusing to give it if (1) the requested instruction states the law correctly; (2) the requested instruction was not substantially covered by the remainder of the jury charge; and (3) the requested instruction's subject matter deals with an issue so important that the district court's failure to give it seriously impaired the defense. *Woodard*, 531 F.3d at 1364.

The jury instruction requested by Dr. Willner concerning his use of advanced registered nurse practitioners reads as follows:

During this trial, you heard evidence of Dr. Willner's use of various advanced registered nurse practitioners ("ARNPs") to see his patients.

When considering the type of work that an ARNP may perform, Florida Law allows an ARNP to perform acts of diagnosis and treatment pursuant to a written agreement called a collaborative practice agreement between the ARNP and a Florida-licensed medical doctor. The agreement should list the duties of both the ARNP and the physician. The agreement should also list the management areas for which the ARNP is responsible, the treatment that may be provided by the ARNP, and the medications the ARNP may prescribe. Any specific procedure that the ARNP is not allowed to perform must also be listed. The collaborative agreement is to be filed with the Board of Nursing on a yearly basis.

Turning to the appropriate level of supervision, unless the collaborative agreement states otherwise, the physician is required to provide general supervision over the ARNP. General supervision does not require the physician to be physically present when the ARNP performs procedures. Instead, the ARNP must only be able to contact the physician by a communication device should they need advice.

In other words, the law permits Dr. Willner's ARNPs to perform acts of diagnosis and treatment pursuant to a written collaborative practice agreement between Dr. Willner and each of his ARNPs. The agreement itself is what establishes Dr. Willner's responsibilities and each ARNP's responsibilities. Dr. Willner's ARNPs are allowed to perform those tasks and treatments that are specifically listed in their collaborative practice agreement with Dr. Willner. Any task or treatment that Dr. Willner does not allow his ARNPs to perform must be listed in that ARNP's collaborative agreement. Under the law, Dr. Willner is not required to be physically present while his ARNPs treat patients. Dr. Willner is only

required to be available by a communication device, such as a telephone, should his ARNPs need to consult with him.

(Doc. 977) (footnotes omitted).  The "collaborative practice agreement" to which this instruction refers reads as follows:[14]

PHYSICIAN ADVANCED REGISTERED NURSE PRACTITIONER
COLLABORATIVE PRACTICE AGREEMENT

Nurse Practitioner:                    Venus Hedgemond, ARNP-BC

Collaborating Physician:          Mark S. Willner, M.D.

    I.       REQUIRING AUTHORITY
        A. Nurse Practitioner Act, Florida Statute, Chapter 464, Chapter 45B(1), Chapter 455.694
        B. Florida Administrative Code, Chapter 64B9-4
    II.      GENERAL AREA OF PRACTICE
        Venus Hedgemond may manage the health care for those patients for which she has been educated.
    III.     SPECIFIC MANAGEMENT AREAS
        A. The following measures may be initiated and performed by Venus Hedgemond under the appropriate consultation and/or supervision:
          1. Assess, monitor, and manage psychiatric disorders
          2. Psychiatric evaluation including psychosocial history and mental status exam
          3. Medication and treatment management
          4. Ordering and interpreting laboratory and diagnostic tests
          5. Initiate referrals and consultations
          6. Provide individual, group, and family psychotherapy
          7. Brief neurological assessments
          8. Routine and standing admission/intake orders and conduct rounds

- Re-initiate psychotropic medications
- Routine lab and x-rays
- Toxicology screen and medication levels
  a. Restriction in mobility or level of observation (inpatient settings)
  b. Order diet
  c. Routine p.r.n. medications

          9. Physical examinations
        B.  The following medications may be prescribed, initiated, or altered by the ARNP in accordance with educational and management protocols:
          1. Analgesics
          2. Anticholinergic agents
          3. Anticonvulsants and mood stabilizers
          4. Antidepressant agents
          5. Antihistaminergic agents
          6. Antihistimanergic agents [sic]
          7. Anti-infective agents
          8. Anti-inflammatory agents

---

[14] We have removed license numbers and addresses for privacy reasons.

9. Antipsychotic agents
10.        Anxiolytic agents and hypnotics
11.        Antihypertensive agents
12.        Autonomic nervous system agents
13.        Endocrine system agents: Thyroid-regulating medications
14.        Eye, ear, nose, and throat preparations
15.        Gastrointestinal agents – laxatives and stool-softening agents, anti-diarrheal agents, antacids, antiemetics
16.        Nutrients, vitamins and minerals
17.        Smoking cessation aides (medications/patches)
18.        Pharmacological treatments for managing alcohol and substance use disorders

All other medications may be adjusted or prescribed under direct supervision with co-signature by the supervising physician.  If in the judgment of the ARNP, the patient requires the initiation of medication not already prescribed by the supervising physician then the medication can be started by the ARNP.

C. Controlled substances may be initiated by Joanne Willis [sic], ARNP, only via verbal, written or telephone order of the M.D. after appropriate Federal and State guidelines have been followed by the collaborating physician.  All verbal and telephone orders will be signed by Mark Willner, M.D.

D. Other measures may be initiated, monitored, or altered depending on the client's condition and the judgment of the ARNP:
1. Detoxification
2. Restraints, seclusion or time out on an emergency basis only
3. Observation and precautions and other measures to insure patient safety
4. Therapeutic passes
5. Baker Acts as allowed by Florida State Law

IV.        SUPERVISION REQUIREMENTS
The ARNP functions mentioned above will be performed under the general supervision of Mark Willner, M.D., or other physicians designated and covering for him in the event that he is unavailable.

V.        REVIEW
This protocol will be reviewed on an annual basis or as deemed necessary by the physician and the ARNP.  In addition, this protocol will be filed with both the Board of Nursing and the Board of Medicine yearly, and a copy will be kept at the practice site.

_____        _____
Mark S. Willner, M.D.                                    Venus Hedgemond, ARNP-BC

_____        _____
Date                                                                Date

(MWEX 166).  Finally, Dr. Ayala's proposed instruction reads as follows:

During the trial, you heard evidence of Dr. Ayala's use of Roger Bergman, a physician's assistant.

28

When considering what work a physician's assistant may perform, Florida Law allows a supervising physician to delegate to a physician's assistant the tasks and procedures within the supervising physician's scope of practice. Specifically, the scope of the supervising physician's practice is defined as those tasks and procedures which the supervising physician is qualified, by training or experience, to perform. The only duties a supervising physician may not delegate to his physician's assistant, except where expressly authorized by statute, are: (1) prescribing, dispensing, or compounding medicinal drugs; and (2) a final diagnosis. All other tasks and procedures may be delegated to a physician's assistant.

In other words, the law permits Roger Bergman, as a physician's assistant, to work in any setting, completing those tasks and procedures Dr. Ayala is qualified, by training or experience, to perform. Specifically, with the exception of the two tasks mention above, the law allows Dr. Ayala to delegate all the tasks and procedures within his practice to Roger Bergman as his physician's assistant.

Turning to the supervision of a physician's assistant, Florida law allows a supervising physician to decide, based on his own reasonable medical judgment regarding the probability of morbidity and mortality to the patient, whether to supervise his physician's assistant directly or indirectly. Under the law, indirect supervision is the easy availability of the supervising physician to the physician's assistant, meaning the ability to communicate with each other by telecommunications and being within reasonable physical proximity to each other.

In other words, Dr. Ayala is not obligated under the law to physically and directly supervise Mr. Bergman's work. Instead, under the law, Dr. Ayala may indirectly supervise Mr. Bergman's work so long as Dr. Ayala is available to Mr. Bergman via some form of telecommunication—for example, by telephone—and is within reasonable physical proximity to him.

(Doc. 974).

29

Applying the *Woodard* analysis, we conclude that the district court did not abuse its discretion in refusing to give these theory-of-defense instructions. The first *Woodard* criterion is that the proposed instructions accurately state the law. The Government does not contend that the instructions proposed by Dr. Ayala and Dr. Willner do not accurately state Florida law regarding a physician's use of advanced registered nurse practitioners and physician's assistants. We accept, without deciding, that the first *Woodard* criterion—that the proposed instructions accurately state the law—is satisfied.

The second *Woodard* criterion asks whether the substance of the proffered instruction is covered in the remainder of the instruction. The Government contends that the district court's good-faith instruction sufficed to allow Dr. Ayala and Dr. Willner to present their Florida-law defense. The district court's good-faith instruction reads as follows:

> Good faith is a complete defense to a charge that requires an intent to defraud. Let me read that again. Good faith is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot be fraudulent intent even if the opinion or belief is mistaken.
> Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent. But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent.

30

(Doc. 1428:112).  We agree with Dr. Ayala and Dr. Willner that this good-faith instruction, without more, did nothing to educate the jury about the extent to which the doctors could use advanced registered nurse practitioners and physician's assistants as a matter of Florida medical practice.  We conclude that the second criterion of *Woodard*—that the substance of the proffered instruction not be covered in the remainder of the jury charge—is satisfied.

We conclude, nevertheless, that the district court did not abuse its discretion because its refusal to give the Florida-law instructions did not impair the ability of Dr. Ayala and Dr. Willner to present their defense.  The Florida-law instructions would have been no help to the doctors because they were neither indicted for nor convicted of unlawfully using medical extenders.  The doctors were indicted for and convicted of conspiring to defraud Medicare by falsifying patient records.  Among the alleged falsities in the patient records were statements that the doctors had seen and treated patients themselves, when their medical extenders had, in fact, seen the patients.  Regardless of whether Florida law allows doctors to treat patients by using medical extenders, neither Florida law nor federal law allows doctors to submit or support a claim to Medicare stating that they have seen a patient themselves when they have not.  Contrary to the doctors' contention, 42 C.F.R. §§ 410.74 and 410.75, and their corresponding statute, 42 U.S.C. § 1395x(aa)(5)(A), merely define the circumstances under which Medicare will pay

31

for the services of physician's assistants and nurse practitioners.   Under these provisions, when a medical extender renders covered services, he may bill Medicare for reimbursement for those services.   These provisions do not say that Medicare will pay a physician for work done by a medical extender.   Finally, there is no evidence in this case suggesting that the doctors signed the alleged false records because they relied on representations from their medical extenders.

The doctors are correct in pointing out that the Government emphasized the lack of face-to-face contact between the doctors and their patients in closing argument.   However, the Government devoted most of its attention to the following evidence: (1) that the doctors signed documents indicating that American Therapeutic's patients were qualified for partial hospitalization services when the doctors knew that they were not; (2) that Dr. Willner routinely signed patients records without reading them; (3) that Dr. Ayala signed and backdated records stating that he had attended to patients when he was out of the country; and (4) that Dr. Ayala signed a patient record stating that he had admitted and treated as an eligible patient someone who was completely catatonic and, therefore, unable to participate in therapy.   We are confident, given this evidence, that an instruction

on the permissible use of medical extenders under Florida law would not have influenced the jury.[15]

The doctors also contend that the Florida-law instructions were relevant to whether the false statements in this case were "material." According to this argument, even if the doctors misrepresented facts to Medicare as to who was seeing the patients face-to-face, the jury could have concluded that these misrepresentations were immaterial. The doctors were free to raise this with the jury, and we see no reason why the Florida-law instructions would have aided the doctors in doing so. The doctors do not claim that Florida law allows them to make these misrepresentations. And, the materiality of these misrepresentations does not turn on what Florida law says about the use of medical extenders.

The district court did not abuse its discretion in refusing to give the Florida-law instructions proffered by Dr. Ayala and Dr. Willner because they have not established that any defense of theirs having any support in the record was seriously impaired in its presentation by the absence of the instructions. We reject this contention as grounds for reversal.

---

[15] We rely on the same analysis in rejecting the doctors' contention that the district court should have given an uncertainty of the law instruction. The doctors contend that there is an "ambiguity" as to the proper role of medical extenders under the law. We find no such ambiguity.

33

## 2. *The Deliberate Ignorance Instruction*

Dr. Ayala and Dr. Willner contend that the district court erred in giving a deliberate ignorance instruction because it allowed the jury to conclude—based on a deliberate ignorance theory—that they willfully joined the conspiracy. The Government contends that a deliberate ignorance instruction is permissible in conspiracy cases in order to establish knowledge of the unlawful purpose, but not to establish that the defendant willfully joined the conspiracy. The Government further contends that, applying this rubric, the instruction was proper in this case.

The district court instructed the jury, in relevant part, that the elements of a conspiracy include that "the defendant knew the unlawful purpose of the plan and willfully joined in it." (Doc. 1428:100). And, when it instructed the jury on deliberate ignorance, the district court instructed the jury that it "may find that a defendant *knew* about the health care fraud scheme if [it] determine[s] beyond a reasonable doubt that the defendant . . . had every reason to know, but deliberately closed his eyes." (*Id.*:112) (emphasis added). In other words, the district court gave a deliberate ignorance instruction on the issue of whether the defendants knew of the unlawful purpose of the conspiracy, but it did not give a deliberate ignorance instruction on the issue of whether the defendants willfully joined in the conspiracy.

Dr. Ayala and Dr. Willner rely on *United States v. Mankani*, 738 F.2d 538 (2d Cir. 1984), for the proposition that a deliberate ignorance instruction is not appropriate in conspiracy cases. *Id.* at 547 n.1 ("[I]f the person can consciously avoid learning about a secret agreement, how then can she manifest an intent to join that agreement?"). However, a number of circuits have disagreed, either reading *Mankani* narrowly or rejecting its reasoning. These circuits conclude that a deliberate ignorance instruction is permissible to establish that a defendant knew of the unlawful purpose of the conspiracy, but not to establish that he willfully joined in the conspiracy. *See United States. v. Diaz*, 864 F.2d 544, 549–50 (7th Cir. 1988) (disagreeing with *Mankani*); *United States v. Brandon*, 17 F.3d 409, 453 n.75 (1st Cir. 1994) ("The willful blindness instruction in this case had to do with the finding that [the] 'defendant acted knowingly' . . . . [T]o the extent our holding in this case differs from that in *Mankani*, we agree with the Seventh Circuit that a willful blindness instruction can be permissible with respect to a conspiracy charge.") (citation omitted); *United States v. Warshawsky*, 20 F.3d 204, 211 (6th Cir. 1994) ("*Mankani* does not apply when deliberate ignorance is used only to establish knowledge of the unlawful aims of a conspiracy.") (citation omitted) *superseded on other grounds as stated in United States v. Myint*, 455 F. App'x 596, 604 (6th Cir. 2012); *see also United States v. Investment Enterprises, Inc.*, 10 F.3d 263, 269 (5th Cir. 1993) (not considering *Mankani* directly, but agreeing with

the distinction drawn in the above cited cases).  In fact, even the Second Circuit itself has retreated from the apparent holding in *Mankani*. *See United States v. Fletcher*, 928 F.2d 495, 502 (2d Cir. 1991) ("We have repeatedly held that a conscious avoidance charge is appropriate where the knowledge of the fraudulent goals of a conspiracy, as contrasted with knowing and intentional participation in the conspiracy, is at issue.") (citation omitted).  We agree with the other circuits that have drawn this distinction and, applying this distinction to the instruction in this case, find no error.

### 3. *The Quindoza Testimony*

Dr. Ayala and Dr. Willner contend that the district court erred by allowing Stephen Quindoza to give expert testimony—both on direct examination and on redirect—about how Medicare operates generally and about the local coverage determination document.  The Government did not disclose Quindoza as an expert witness under Federal Rule of Criminal Procedure 16(a)(1)(G).  Dr. Ayala and Dr. Willner also contend that the district court erred by not allowing them to cross examine Quindoza to the extent required by the Sixth Amendment Confrontation Clause.   The Government contends that the district court properly allowed Quindoza to testify as a fact witness.  According to the Government, his testimony was based on his personal knowledge from working as a Medicare fraud investigation educator and was not expert testimony.  On the Sixth Amendment

issue, the Government contends that Dr. Ayala and Dr. Willner were allowed to cross examine Quindoza to a degree sufficient to satisfy the Confrontation Clause, even if the district court limited the cross examination to some degree.

We review for an abuse of discretion a ruling that admits or excludes evidence. *United States v. Graham*, 643 F.3d 885, 896 (11th Cir. 2011); *United States v. Trujillo*, 146 F.3d 838, 843 (11th Cir. 1998). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).

Below are a number of representative excerpts from the Government's direct examination of Quindoza:[16]

> Q. Does Medicare pay for group therapy that is not individualized?
> A. No, it does not.
>     [Counsel for Dr. Willner]: Excuse me.  Objection.  This is beyond reading the [local coverage determination documents].  It's now interpreting them, Judge.  I object.
>     THE COURT: I'm going to overrule the objection on this one. It's simply a fact.  Does it pay for day care, yes or no?
> Q. Does Medicare pay for adult day care, sir?
> A. No, it does not.
> Q. Does it pay for group therapy that's not individualized?
> A. No, it does not.
> Q. Does it pay for purely recreational therapy?
> A. No, it does not.
> Q. How about psychosocial services?

---

[16] There were seven separate defendants in this trial.  The parties agreed that counsel for one of the defendants could object on behalf of all defendants in order to expedite the trial process.

[Counsel for Dr. Ayala]: Your Honor, may we have a continuing objection as to this line of questioning, so that we don't have to interrupt [counsel for the Government]?

THE COURT: Yes, you may.

[Counsel for Dr. Ayala]: Thank you.

Q. Psychosocial services?

A. No, it does not.

* * *

Q. [D]oes Medicare pay for claims where the documents are missing or incomplete?

A. No, it would not.

* * *

Q. [C]an you please briefly explain what doctors need to do in order to bill Medicare[?]

A. A couple of things.

[Counsel for Dr. Ayala]: Objection.  Beyond.  I can explain what -- He's testifying from the documents at this point, or is he testifying as an expert in this area, is the question.

THE COURT: I thought he was --

[Counsel for the Government]: I thought we rehashed that yesterday.  But --

THE COURT: I'll overrule the objection.  Thus far, what I have heard comes within the scope of 701 and not 702.  But I appreciate counsel's helping me be vigilant on this.

[Counsel for Dr. Ayala]: Thank you.

THE COURT: Because it's very important.  Okay.

A. First of all, of course, of [sic] the physician has to be appropriately licensed as a physician in the state in which they're practicing.  Second, in order to bill the Medicare program, that physician must first apply for and receive [sic] privileges to bill the Medicare program.  There is an application process.  There is a physical application that that physician must submit to the Medicare program in order to be approved and receive the billing privileges.

* * *

Q. Mr. Quindoza, does Medicare perform audits and inspections of [community mental health centers]?

A. Yes, sir.

Q. And do the audits include auditing of files at the [community mental health centers]?

A. Yes, sir.

38

Q. Files related to [partial hospitalization program] services?

A. Yes.

Q. Does Medicare also perform random audits of the [community mental health centers]?

A. Yes.

Q. Routine audits as well?

A. Yes.

Q. And what are the Medicare auditors looking for when they do their audits?

A. They're looking to verify the validity of the services that are billed to Medicare.

Q. If the documentation is incomplete, does Medicare pay?

A. It should not, no.

Q. Are there a range of options that could happen?

A. Yes.

Q. Could you please describe them for the jury?

A. Okay.  Several things can happen.  If the claim was already submitted, processed, and paid by Medicare, the Medicare program can request repayment of that claim if it is determined that it should not have been covered in the first place.  If the audit or that review is conducted while the claim is submitted and yet to be completed, the Medicare program can withhold payment of that claim if it is determined that the claim is not appropriate.  The other things that the Medicare program can also do is it can suspend payments of a health care provider.  And let me explain what that is.  It means that there's an indication that either something is wrong with a majority or most of the claims that they submit, or that there's [sic] indications that the claims that they have submitted were not supposed to be paid, so, therefore, Medicare will withhold payments even though the claims have already been processed.  The other option they have is they can revoke that provider's billing privileges.  In other words, they won't be even able to submit claims to the Medicare program.

Q. So, I'm going to try to put it in my own words here.  The options are Medicare stops paying, says "pay me back," suspends the agency, or revokes their ability to actually bill Medicare.

A. Correct.

Q. What if the documentation has been forged or altered, would Medicare pay the claims?

A. It would not.

Q. And what are the range of options that could happen in that circumstance?

A. Again, it would be one of the four that I just described.

Q. Sir, are you familiar with sleep studies?

A. Yes.

Q. Does Medicare pay for them?

A. Yes.

Q. Are you familiar with the rules for sleep study reimbursement by Medicare?

A. Yes.

Q. Can you please describe them in very plain English to all of us?

A. Okay.  Of course, for a sleep study to take place, the patient must have a problem with sleeping, for lack of a better term.  The study itself is a test.  Therefore, the test must be ordered by a physician who diagnosed the patient in the first place.

Q. Does Medicare reimburse for sleep study claims where the patient does not have a sleep disorder?

A. No, it would not.

Q. Would Medicare reimburse a claim for a sleep study patient where the patient was procured by a kickback or a bribe?

A. No, it would not.

(Doc. 1386 at 32–45).

The district court abused its discretion in allowing this testimony by Quindoza on direct examination because Quindoza gave expert testimony but had not been disclosed as an expert.  Quindoza is a Medicare fraud investigation educator.  He is not an employee of Medicare, but works for a private contractor that investigates Medicare fraud.  He testified in the form of opinions on a number of issues involving how Medicare functions and what Medicare would do in a number of hypothetical circumstances.  This testimony was "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," and the

district court erred in determining that it was permissible under Rule 701. FED. R. EVID. 701–02.  Permitting this testimony was error.[17]

We now turn to the questions the Government asked on redirect.  To put this testimony into context, we begin with certain questions that counsel for Dr. Willner asked on cross examination.

> Q. [I]s there anything in the [local coverage determination document] that [requires] the physical examination . . . to be done solely or exclusively by a doctor?
> A. In this section?
> Q. Yes.
> A. It does not say that here.
> Q. Well, does it say anywhere that it has to be done solely and exclusively by a doctor?
> A. Yes
> Q. Okay.  Tell us where that is.
> A. The regulation specifies that the certification and the treatment plan has to be done by the patient -- I'm sorry, not by the patient -- by the doctor who is treating the patient.
> Q. But he can do that along with his medical extenders, correct?
> A. But the language doesn't say that.  It says "the physician."
> Q. Let's go back, then, to the language of a community-based health center.
> A. Okay.
> Q. The language allows it to be done consistent with state law, correct?
> A. That is correct.
> Q. If the state law allows it to be done with a medical extender, then it would be permissible, correct?
> A. To the extent of the services provided in the community mental health center.  That's the supervision that they're discussing.
> Q. That's correct.  And that's what we're talking about, correct?

---

[17] As to Quindoza's testimony reading from the local coverage determination document, this document was already in evidence.  Anyone can state what a document says or read from it if it has been admitted into evidence, and permitting this testimony was not error.

A. As far as the order of the services?

Q. No.  As far as the doctor being able to use a professional -- properly trained professional to assist him in rendering these services. That's permissible, correct?

A. Yes, sir, it is.

(Doc. 1386 at 60–61).  After this cross examination, the Government asked the

following questions on redirect.

Q. Can you show me where it says "physician's assistant" [in an excerpt from the location coverage determination document]?
A. It does not.
Q. How about [advanced registered nurse practitioner]?
A. It does not.
Q. Does it reference the physician?
A. Just the physician.
Q. And does the physician actually have to see the patient, sir?
A. For any order, yes.
    [Counsel for Dr. Willner]: Objection.  Leading.
    THE COURT: Overruled.
Q. You may answer.
A. For any service that is furnished upon the order of a physician, there has to be evidence that that physician treated that patient prior to the services ever being furnished.
                              * * *
Q. Can you show me where it says "physician's assistant" [in a different excerpt from the local coverage determination document]?
A. It does not.
Q. How about [advanced registered nurse practitioner]?
    [Counsel for Dr. Ayala]: Your Honor, I have a motion to make. Can I reserve it?  Unless you want me to come up.
    THE COURT: Why don't you reserve it?
    [Counsel for Dr. Ayala]: Thank you.  Appreciate that.
Q. How about [advanced registered nurse practitioner]?
A. No it does not.
Q. Does that mean the physician actually has to treat the patient?
A. Yes.
[The witness then read from an excerpt in the local coverage determination document.]

42

Q. Patient interviews?  Does that mean the physician actually has to
see the patient?
A. Yes.

(Doc. 1386 at 79–80).  (The motion that was reserved by counsel for Dr. Ayala
was for a mistrial.  The district court denied the motion.)

Under the circumstances, we find that the district court did not abuse its
discretion in allowing this testimony.  Counsel for Dr. Willner elicited opinion
testimony from Quindoza during cross examination concerning what the local
coverage determination document means and whether Medicare allows doctors to
use medical extenders rather than see patients face-to-face.  Once counsel for Dr.
Willner elicited this testimony (without objection), the district court could, within
its discretion, allow the Government to rehabilitate its witness and clarify the
content of his opinion.

Finally, we turn to Dr. Ayala's and Dr. Willner's contention that they were
not permitted to cross examine Quindoza in their initial cross in the manner
required by the Sixth Amendment Confrontation Clause.  After counsel for Dr.
Willner attempted to explore the basis for Quindoza's opinions, the district court
sustained an objection by the Government.  Below is the colloquy that followed.

[Counsel for Dr. Willner]: And you're telling me that I cannot
now explore with him the basis under which he is able to testify?
[Counsel for the Government]: It's beyond the scope.
THE COURT: It's beyond the scope.

43

[Counsel for Dr. Willner]: Any witness who testifies you're able to explore the basis of their knowledge of their testimony, any witness.  It is fundamental cross.

THE COURT: What is it relevant to at this point?

[Counsel for Dr. Willner]: I want to show the jury that he's biased.  That's what it's relevant to.  He's not -- He's an investigator.  His job is to ferret out fraud.  He thinks there's fraud here, and he wants the conviction.  Bias.

THE COURT: I don't think he's testified to that.

[Counsel for the Government]: He has not.

[Counsel for Dr. Willner]: Judge, because he hasn't testified to it doesn't mean I can't explore it and show it.  I believe I can show it.

[Counsel for the Government]: It's beyond the scope.

[Counsel for Dr. Willner]: Because you stayed away from it doesn't mean that I'm --

[Counsel for the Government]: You told me to stay away from it.

THE COURT: I will sustain the objection.

(Doc. 1386 at 50–51).

The district court abused its discretion in not allowing Dr. Ayala and Dr. Willner to cross examine Quindoza on the basis for his testimony and his potential bias.  As counsel for Dr. Willner stated during the colloquy, exploring the basis for a witness's knowledge and any potential bias that could affect his testimony cannot be "outside the scope."  This is particularly true for a government witness during a criminal case. *See* U.S. CONST. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 320, 94 S. Ct. 1105, 1112 (1974) (describing effective cross examination involving bias as a "vital . . . constitutional right"); *id.* at 316, 94 S. Ct. at 1110 (such testimony is

44

"always relevant as discrediting the witness and affecting the weight of his testimony") (quotation omitted).[18]

For the foregoing reasons, the district court erred in allowing Quindoza to testify as an expert and in not allowing Dr. Ayala and Dr. Willner to cross examine Quindoza on the basis for his knowledge and his potential bias.

### 4.  *Harmless Error Analysis*

Having found two errors in the district court's handling of the Quindoza testimony—one non-constitutional error (allowing him to render expert testimony about Medicare), and one constitutional error (limiting bias cross-examination of Quindoza that the Sixth Amendment required the district court to allow)—we now determine whether these errors affected the doctors' substantial rights. FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

With respect to non-constitutional errors—here, Quindoza's improper expert testimony—the Supreme Court defined "affect[ing] substantial rights" in *Kotteakos v. United States*:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous actions from the whole, that the judgment was not substantially swayed by the error, it is

---

[18] Dr. Ayala and Dr. Willner also contend that the district court erred in not allowing Dr. Ayala and Dr. Willner to call a rebuttal expert.  This witness was not properly disclosed, and allowing this testimony would have been error for the same reason that allowing Quindoza's testimony was error.

impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct, 1239, 1248 (1946); *see*

*United States v. Hornady*, 392 F.3d 1306, 1316 (11th Cir. 2004) (collecting cases).

In *Hornady*, the issue was whether a verdict should be reversed because the district

court included in the jury charge an aiding and abetting instruction that had no

support in the record. Applying *Kotteakos*, the *Hornady* court reasoned that, "after

seeing and hearing all of the evidence in this case[,] no reasonable jury would have

been influenced by a jury instruction and prosecutorial argument on liability under

18 U.S.C. § 2." *Id.* at 1317. When there is overwhelming evidence of a

defendant's guilt, the non-constitutional error is harmless. *See United States v.*

*Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) (holding that improper cross-

examination of a defendant's character witness did not affect substantial rights

because of the "overwhelming evidence of [the defendant's] guilt"); *United States*

*v. Herzberg*, 558 F.2d 1219, 1224 (5th Cir. 1977) (improper admission of character

evidence against the accused did not substantially sway the judgment because the

evidence of guilt was "overwhelming"); *United States v. Constant*, 501 F.2d 1284,

1289 (5th Cir. 1974) (holding that improper cross-examination about defendant's

prior criminal record did not affect substantial rights because of "overwhelming" evidence of guilt).

While we analyze whether constitutional errors have affected substantial rights in the same way that we analyze whether non-constitutional errors have affected substantial rights, the constitutional error's effect must clear a higher bar to avoid reversal: it must be "harmless beyond a reasonable doubt." *See Chapman v. California*, 366 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).  We are charged, "based on our own reading of the record and what seems to us to have been the probable impact" of the constitutional error, to determine whether reversal is warranted. *Harrington v. California*, 395 U.S. 250, 254, 89 S. Ct. 1726, 1728 (1969).  One circumstance in which courts find constitutional errors harmless beyond a reasonable doubt is when the evidence of the defendant's guilt is "so overwhelming." *Id*.

Applying these standards, we conclude that the district court's errors in allowing Quindoza to give expert testimony about Medicare and in limiting the defense's cross-examination of Quindoza are not bases for reversal.  We base our conclusion on the overwhelming evidence of the doctors' guilt as charged in the indictment.[19]  While at American Therapeutic, Dr. Ayala and Dr. Willner rarely, if

---

[19] The "Manner and Means" portion of the indictment (Doc. 26) charges the doctors with altering diagnoses, and medication types and levels, "to make it falsely appear that the patients . . . were qualified for PHP services"; that they would lengthen patient stays not on the basis of

47

ever, saw patients, much less treated them, monitored their progress, or discharged them on medical grounds. Dr. Willner received, on average, $ 214,000 annually *to sign charts*. The overwhelming evidence is that he did not discuss patients, their treatment, or their progress with his advanced registered nurse practitioners, and, for that matter, did not know whether *they* had seen or treated the patients. Dr. Willner was listed as attending physician for American Therapeutic claims to Medicare totaling $ 70.4 million despite working there only two to three hours per week for three years. A therapist resigned on the spot after she told Dr. Willner that her therapy notes had been altered, and he said, "[t]hey know what they're doing." For his part, Dr. Ayala demanded that American Therapeutic pay *him* kickback money for any patients of his that were referred to American Therapeutic. He told an assisted living facility owner that American Therapeutic would pay the owner for patients, and he facilitated the owner's getting the money that was owed him. Dr. Ayala signed and dated patient charts for admissions and discharges that occurred while he was out of the country. Like Dr. Willner, he signed hundreds of charts without having seen or treated the patients, and without knowing whether his physician's assistant had done so (because he did not discuss it with him). He

---

medical need, but on the basis of the maximum number of days for which Medicare would pay; that they would authorize treatment and continuation of treatment without examining patients; that they authorized American Therapeutic to use their Medicare numbers so that they could be billed as attending physicians in furtherance of the fraudulent scheme; and that they would deliberately authorize unnecessary sleep studies at American Sleep. (Doc. 26, ¶¶ 11–15).

48

represented to Medicare that he had treated patients personally when he knew he had not. Finally, although he was not paid as handsomely as Dr. Willner for simply signing charts, he received from American Therapeutic approximately $ 126,729 annually for signing charts. This evidence and the evidence discussed in Section III.B., *supra*, overwhelmingly demonstrate that these doctors were guilty of the conspiracy charged in the indictment. We find no reversible error with respect to the convictions of Dr. Alberto Ayala or Dr. Mark Willner.

## C.  Morris

The Defendant Morris presents three contentions, two of which are adoptions of the Quindoza arguments made by Dr. Ayala and Dr. Willner. Nothing about Quindoza's testimony is relevant to the kickback conspiracy for which Morris was charged.

Morris's third contention is that the Government called attention to his Fifth Amendment right to remain silent when questioning a witness. A fellow Behavioral Health Promoter who testified for the Government said that she once explained to Morris a discrepancy in cash to be delivered to a referral source. "And how did he respond?" asked the prosecutor. The witness answered: "We could not communicate very well because of the language, but he let me know that people were complaining because of the delay and because the money was not there on time." (Doc. 1408:52). Morris argues that "[t]his line of questioning

49

placed in the jury's mind that [Morris] had not spoken to the Government to provide his side of the story. (Brief of Hilario Morris at 25).

Morris did not object to this testimony.  On appeal, however, he argues that admitting it was plain error.  We conclude, however, that there was no error in its admission and, therefore, no plain error.

For these reasons, we affirm the conviction of Hilario "Larry" Morris.

*United States v. Lydia Ward, Ph.D*, Case No. 13-10533[20]

━━━━━━━━━━━━━━━━━━━━━━━━━━━

Having considered the contentions of all parties in the first case, we now turn to Dr. Ward's contentions in the second case.  Dr. Ward was only charged with the Count I conspiracy.  The indictment alleges the same specific charge concerning her role in the conspiracy that the indictment alleges against Dr. Abreu. *See* Section IV.A., *supra*.[21]  The jury found Dr. Ward guilty of this charge at the second trial.  In light of Dr. Ward's contentions, it is unnecessary to extensively review the evidence in the second trial.

Dr. Ward was hired by American Therapeutic as a Program Director.  She was responsible for every part of her center's physical plant, for daily updates to

---

[20] We remind the reader that the earlier section of this opinion entitled, "II. Medicare Coverage of Partial Hospitalization Services," is incorporated here.

[21] Evidence of the fraudulent scheme that we discussed in Section III of the first case, *United States v. Willner, et al.*, No. 12-15322, is similar to the evidence of the fraudulent scheme that was admitted at the second trial.

clinicians regarding corporate directives and patients, for scheduling clinicians and therapists, for placing patients in appropriate treatment tracks, for communications with corporate headquarters, and a host of related activities.

Dr. Ward presents two contentions regarding the testimony of Stephen Quindoza.  Dr. Ward's first contention is that Quindoza was an expert who should not have been allowed to testify as a fact witness.  Quindoza's testimony was substantially similar to his direct examination in the first trial, Case No. 12-15322.  But, the contentions of Dr. Ayala and Dr. Willner concerning cross examination and redirect—namely, Quindoza's opinion about whether doctors have to physically see patients and the Confrontation Clause issue—did not arise in the second trial.  We conclude that allowing Quindoza to testify as an expert was error for the reasons stated in Section IV.B.3, *supra*.  In this case, however, Dr. Ward has failed to show that the expert testimony was prejudicial to her case.  We conclude, therefore, that it did not affect her substantial rights. *See* FED. R. CRIM. P. 52(a).

Dr. Ward's second contention is that she should have been allowed to call Karen Panzer as an expert to rebut Quindoza's testimony.  Panzer was permitted to testify as a fact witness, but was not permitted to give expert testimony.  Panzer was last involved with Medicare in 1998 and had no experience with partial

hospitalization programs.  The district court did not err in concluding that Panzer was not qualified and in excluding her testimony for that reason.

Dr. Ward presents three additional contentions concerning evidence to which she did not object at trial.  Dr. Ward contends: (1) that a co-defendant's post-arrest statement allegedly implicating Dr. Ward should not have been admitted; (2) that the Government questioned its witnesses about their guilty pleas in order to prove Dr. Ward's guilt; and (3) that the Government should not have been allowed to cross examine Dr. Ward about whether other witnesses were lying. Dr. Ward has not briefed plain error on any of these contentions.  Because Dr. Ward did not object to this evidence at trial, these contentions are subject to plain-error review. FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").  We conclude that Dr. Ward has not shown that any of this evidence, even if erroneously admitted, affected her substantial rights.

We conclude that there is no reversible error presented by the appeal of Dr. Ward.

## V.  Conclusion (Both Cases)

We reverse the conviction of Dr. Abreu in Case No. 12-15322, vacate her sentence, and hereby enter a judgment of acquittal.  We affirm in Case No. 12-

52

15322 the convictions of Alberto Ayala, M.D., Hilario "Larry" Morris, and Mark Willner, M.D.

In Case No. 13-10533, we affirm the conviction of Dr. Ward.

CASE NO. 12-15322:  AFFIRMED IN PART AND REVERSED IN PART.

CASE NO. 13-10533:  AFFIRMED.