[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11775
_____

D.C. Docket No. 1:15-cr-20973-KMW-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL ROJAS,
BARBARA ROJAS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 31, 2020)

Before MARTIN and NEWSOM, Circuit Judges, and WATKINS,* District Judge.

---

* Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

PER CURIAM:

This is the direct criminal appeal of Barbara and Michael Rojas, a mother and son who were convicted of conspiracy to commit bank fraud and wire fraud, wire fraud, and bank fraud as a result of their participation in a complex mortgage-fraud scheme. Michael was sentenced to 136 months' imprisonment, and Barbara was sentenced to 114 months' imprisonment. Between them, the Rojases raise a number of issues on appeal. After careful consideration, we affirm both their convictions and sentences.

## I

## A

The facts of this case center on a mortgage fraud conspiracy that took place during the real estate boom of 2005–2007. The conspiracy involved recruiting straw buyers with good credit scores to apply for mortgages to purchase million-dollar homes in Miami. Despite their decent credit, the straw buyers were of modest means and couldn't actually afford the mortgages or provide the requisite cash-to-close. They were nevertheless granted mortgages based on forged bank statements and loan documents filled with material misrepresentations about their professions, assets, and abilities to pay—including, notably for our purposes here, that they wouldn't need to borrow any money to pay closing costs. Most of the transactions at issue in this appeal involved two affiliated entities—Sun Trust Bank

2

(STB), and its wholly-owned subsidiary, Sun Trust Mortgage, Inc. (STMI); STB provided the loan money to STMI, which was responsible for issuing the loans.

Once the banks approved the loan applications, they would wire the loan money to Miller Title & Escrow, L.L.C. (Miller Title). Michael and Barbara, who was a licensed closing agent, operated Miller Title, which was responsible for certifying the fraudulent HUD-1 Settlement Statements used to acquire the loans. The Rojases also ran a sister organization, BND Title Services, Inc. (BND), through which they routed portions of the loan money received by Miller Title to be used to fund the buyers' cash-to-close payments. BND also retained a portion of the loaned funds, which in theory would have been due to the buyer. Eventually, each of the properties purchased as part of the conspiracy went into foreclosure, as the straw buyers defaulted on their mortgages.

## B

A grand jury issued a superseding indictment charging the Rojases with the following: one count of conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349; ten counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343; and two counts of bank fraud, in violation of 18 U.S.C. § 1344. Michael was also charged with an additional count of bank fraud related to a separate transaction involving the purchase of a personal residence. The wire-fraud counts involved STB and STMI, and the bank-fraud counts

3

involved Washington Mutual and Indy Mac Banks. Unlike the rest of their indicted co-conspirators, the Rojases chose to go to trial, where a jury found them guilty on all counts. Michael was sentenced to 136 months' imprisonment, and Barbara was sentenced to 114 months' imprisonment.

The Rojases raise the following issues on appeal: (1) whether there was sufficient evidence that their crimes affected a financial institution for purposes of the wire-fraud counts involving STB and STMI; (2) whether there was sufficient evidence of Barbara's intent to defraud[1]; (3) whether the district court abused its discretion by (a) preventing Michael's mental-health expert from testifying about his intent to defraud or (b) rejecting his theory-of-defense jury instruction; (4) whether the district court erred in allowing a lay witness to testify about Michael's signature; (5) whether the district court erred by not ruling on Barbara's motion *in limine* relating to "good conduct" evidence; and (6) whether the Rojases' sentences were substantively unreasonable. We'll take these arguments in turn.

---

[1] In his brief, Michael appears to adopt Barbara's sufficiency-of-the-evidence argument, but he does not discuss any sufficiency issues unique to his case. A defendant cannot adopt a co-defendant's sufficiency challenge, because "the fact-specific nature of an insufficiency claim requires independent briefing if we are to reach the merits." *See United States v. Khoury*, 901 F.2d 948, 963 n.13 (11th Cir. 1990). As a result, we will not review the sufficiency of the evidence as to Michael's intent to defraud.

4

## II

First we'll discuss whether there was sufficient evidence that the Rojases' wire fraud "affect[ed] a financial institution" within the meaning of 18 U.S.C. § 1343.  We review the sufficiency of the evidence de novo "in the light most favorable to the Government, . . . drawing all reasonable inferences and credibility choices in the Government's favor."  *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013).  "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *Id.* at 1297 (quotation omitted).

The Rojases were charged with wire fraud affecting a financial institution under 18 U.S.C. § 1343—this Court has held that exposing a financial institution to "an increased risk of loss" is sufficient to satisfy the statute's "affect[ing] a financial institution" element.  *See United States v. Martin*, 803 F.3d 581, 587–88, 590 (11th Cir. 2015).[2]  Along those lines, the district court here instructed the jury that an act "[a]ffect[s] a financial institution" if it "expos[es] the financial institution to an actual loss or . . . an increased risk of loss."

---

[2] The statute of limitations on wire fraud is ten years "if the offense affects a financial institution."  18 U.S.C. § 3293(2).  As the government notes in its brief, because the Rojases' crimes took place between 2006–2007, but they weren't indicted until 2015 and 2016, without a finding that the crimes affected a financial institution the prosecution could run into statute-of-limitations issues.

5

On appeal, the Rojases argue that "[t]here was neither federal jurisdiction nor sufficient evidence to convict" them on their wire-fraud counts involving STB and STMI, "because the overwhelming evidence at trial was that STMI, which was not federally insured at the time, was the entity that was materially affected by the indicted fraudulent conduct," not STB, the federally insured financial institution. Br. of Appellant M.R. at 40, 43.  The Rojases' argument focuses largely on the government's evidence about whether STMI was actually a wholly-owned subsidiary of STB—they note that this relationship was established through testimony stated in the present tense, which they argue doesn't sufficiently show that STMI *was* a wholly-owned subsidiary at the time of the crimes.[3]

The government, on the other hand, argues that the evidence presented established that the Rojases' crimes affected a financial institution, because it clearly demonstrated that STB provided the money used in STMI's loans to the straw buyers.  Indeed, when STB wired the loan money to STMI, it was recorded as a "general ledger credit" offset by a "general ledger debit" for STMI.  The government contends, therefore, that STB's provision of the loan money alone "established the necessary exposure to an increased risk of loss," as the "debts

---

[3] The Rojases also argue that they were "not on notice that STB would be affected by a default on a mortgage solicited by, processed, reviewed and approved by STMI."  Even if we assume that's true, 18 U.S.C. §§ 1343 and 3293(2) do not include a knowledge requirement as to the scheme's effect on a financial institution—this distinguishes wire fraud from bank fraud, for example, which does include such a knowledge requirement, *see* 18 U.S.C. § 1344.

affected [its] financial condition and balance sheet"—if the straw buyers didn't repay STMI, then STMI wouldn't be able to repay STB.[4] Br. of Appellee at 16–17.

We conclude that the evidence here was sufficient to demonstrate that the Rojases' crimes affected STB. The fact that STB was the source of the loan money distributed by STMI put it at an increased risk of loss sufficient to implicate the "affects a financial institution" language in 18 U.S.C. §§ 1343 and 3293(2). *Cf. Martin*, 803 F.3d at 590.

### III

Next we'll discuss Barbara's sufficiency-of-the-evidence claim. A common element to all of Barbara's counts of conviction is that she acted with an intent to defraud. *See* 18 U.S.C. §§ 1343, 1344, 1349; *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) ("Proof of intent to defraud is necessary to support [a] conviction[] for . . . wire fraud."); *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004) (noting that the government must demonstrate an "intent to defraud" to convict a defendant of bank fraud). Barbara contends that the evidence produced at trial was insufficient to prove that she "knew of the fraudulent scheme

---

[4] The Rojases argue that "[t]he fact that some loan funding was wired directly from STB to Miller [Title], without more, did not mean that STB would incur any loss." Sections 1343 and 3293(2) don't have actual-loss requirements, so this argument is unavailing. *See, e.g.*, *Martin*, 803 F.3d at 589 (noting that despite the "possibility that [the bank] suffered no loss, it was nonetheless defrauded," as the "scheme to defraud is all that the government must prove").

7

concocted by others and acted with the requisite specific intent to violate the law." Br. of Appellant B.R. at 14. Specifically, Barbara alleges that the evidence at trial merely demonstrated that "she was a title agent who may have signed an unidentified number of checks to close"—she says that there wasn't any evidence "that she was personally involved in any of the closings or had any knowledge of the fraudulent conduct of" her co-conspirators or "that she prepared or signed any of the loan application documents." *Id.* at 14–15.

The government responds by citing several pieces of key testimony implicating Barbara in the fraud. First, it references the testimony of Carlos Jitric, one of the Rojases' co-conspirators who was responsible for recruiting the straw buyers. When asked on the stand whether he "ever s[a]t down and discuss[ed] [the] scheme with Barbara Rojas," Jitric unequivocally said yes, noting that he spoke with her about the transactions "[a]round 2005" and told her "[t]hat the buyers didn't have the amount of money for the closing and the documents were not legit." Additionally, some of Barbara's co-conspirators—including Michael— confirmed that she signed checks and wrote out deposit slips that were integral to the conspiracy. Miller Title employee Roxanna Tanaka testified that she knew the company was engaged in wrongdoing, but she followed Michael and Barbara's orders because they were her employers. For example, Tanaka explicitly stated

8

that Barbara told her to tell anyone who asked about BND that it "no longer existed and [she] had no information."

Reviewing the evidence in the light most favorable to the jury verdict, we conclude that it was sufficient to establish Barbara's intent to defraud. *See Capers*, 708 F.3d at 1296–97. Barbara owned and operated both Miller Title and BND, and multiple individuals involved in the conspiracy testified about her involvement in and knowledge of the fraudulent scheme.

## IV

On, then, to Michael's contentions pertaining to his mental-health-related arguments. One of Michael's defenses at trial was that he was in a manic state at the time of many of the relevant transactions, which negated the specific intent necessary to commit the charged crimes. The government moved *in limine* to prevent Michael from introducing expert testimony from Dr. Mark Mills that Michael's bipolar disorder prevented him from being able to form an intent to defraud, and the district court conducted a *Daubert* hearing.

Although Dr. Mills was ultimately allowed to testify, the scope of his testimony was limited—the parties agreed that the following instructions would be read before Dr. Mills's testimony:

> Dr. Mills may not offer an opinion on the ultimate issue to be decided by the jury, which is whether or not defendant Michael Rojas had the requisite mens rea to commit the crimes charged in the superseding indictment. Rather, he is to confine his testimony to the

9

meaning of terms like manic and psychosis, and he may discuss his diagnosis, characteristics of Bipolar I disorder and its typical effect on a person's mental state but not specifically on the defendant's actual intent to the charged crimes.

Dr. Mills may not at any time state that the defendant lacked the capacity to form the mens rea either in mid-2007 or any other time.

Dr. Mills' testimony must be confined to the specific time period of mid-2007 when the defendant was diagnosed as having Bipolar I disorder and with the purchase of [his personal residence], and to no other event nor time period . . . .

Dr. Mills went on to testify at trial that Michael suffered from Bipolar I disorder and that he experienced instances of severe mania and "outright psychosis, periods where he's really . . . kind of crazy," which could render him "[g]rossly impaired" and diminish his judgment.

## A

Michael first argues that the district court erred by not allowing Dr. Mills to testify that a person with his disorder wouldn't be able to form the requisite intent to commit fraud. The government, on the other hand, argues that the district court's exclusion of this testimony was a straightforward application of Federal Rule of Evidence 704(b), which states the following: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a

10

mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

We review evidentiary rulings for abuse of discretion. *See United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007). We hold that the district court did not abuse its discretion by excluding testimony by Dr. Mills that someone with Michael's condition would not be able to form the requisite intent to commit fraud. *See, e.g.*, *United States v. Jeri*, 869 F.3d 1247, 1266 (11th Cir. 2017); *United States v. Manley*, 893 F.2d 1221, 1223 (11th Cir. 1990) (noting that "[c]ourts cannot permit the use of the hypothetical question as a vehicle to circumvent the clear mandate of Rule 704(b)"). And even if the exclusion of this testimony was an error, it would nevertheless be harmless. *United States v. Dulcio*, 441 F.3d 1269, 1274 (11th Cir. 2006). Michael stipulated to this limitation, and he was able to introduce ample "psychiatric evidence to negate specific intent." *United States v. Ettinger*, 344 F.3d 1149, 1153 (11th Cir. 2003).

**B**

Michael also challenges the district court's refusal to give the following jury instruction:

> The burden is on the government to prove that Mr. Rojas had specific intent to commit the fraud alleged in the indictment. There has been testimony that Mr. Rojas, during the relevant time period of the indictment, was suffering from a mental health condition that may have impacted his judgment. If you find that Mr. Rojas was, in fact, suffering from a mental illness and that the mental illness affected his

11

judgment to the extent that it would have made it difficult for him to appreciate the fraudulent scheme perpetrated by Mr. Jitric and others; you may consider that information in determining whether the government has established that Mr. Rojas had specific intent to commit the offenses charged.

Instead, the district court said the following about Michael's defense theory:

> Their theory of defense, defendant Michael Rojas' theory, is that he did not act knowingly, willfully, and with specific intent to commit the crimes charged. . . .
>
> Understand, ladies and gentlemen, it is not the defense's theory that the defendant Michael Rojas was insane at the time the offenses were committed. Rather, his theory is that he could not formulate the specific intent in mid-2007 to commit the charged offenses because of a bipolar disorder.

We review a district court's refusal to give a requested theory-of-defense instruction for an abuse of discretion. *United States v. Willner*, 795 F.3d 1297, 1310 (11th Cir. 2015). The court abuses its discretion by refusing to give a requested instruction when "(1) the requested instruction states the law correctly; (2) the requested instruction was not substantially covered by the remainder of the jury charge; and (3) the requested instruction's subject matter deals with an issue so important that the district court's failure to give it seriously impaired the defense." *Id.* District courts have "broad discretion to formulate jury instructions provided those instructions are correct statements of the law"—we "defer to the district court on questions of phrasing." *United States v. Miller*, 819 F.3d 1314, 1316 (11th Cir. 2016) (quotation omitted).

12

Michael argues that the district court's chosen charge was "fatally incorrect" for two reasons:  (1) "because the testimony of Dr. Mills was that [Michael] had Bipolar I Disorder during the entire time of the charged conspiracy . . . not just mid-2007," and (2) that the charge "deprived [the jury] of the critical missing testimonial link" that a person suffering from Bipolar I Disorder would not "be able to form the requisite specific intent to engage in a complex fraud."  Br. of Appellant M.R. at 54–55.  The government, on the other hand, contends that Michael's proposed jury instruction misstated the law of this Circuit, which holds that psychiatric evidence is relevant only to completely negate specific intent—not to argue that a defendant's disorder might have impaired his judgment.  *See, e.g.*, *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990) ("[I]t is clear that Congress meant to eliminate any form of legal excuse based upon one's lack of volitional control.  This includes a diminished ability or failure to reflect adequately upon the consequences or nature of one's actions.").  Further, the government asserts that the mid-2007 time limitation was stipulated to by the parties, *see supra* at 10, and that, in any event, Michael only testified that he was manic in mid-2007.

Here, we conclude that the district court did not abuse its discretion in rejecting Michael's requested theory-of-defense instruction.  Michael's proposed instruction did not accurately characterize the law in this Circuit, *see id.*, and, in

13

any event, the substance of the district court's instruction correctly stated the law and reflected the parties' stipulated statement read before Dr. Mills's testimony; its substitution for Michael's preferred instruction in no way "seriously impaired" his defense, *see Willner*, 795 F.3d at 1310.  The district court acted well within its broad discretion here.

## V

Michael also challenges the testimony of a government witness identifying his signature on an exhibit at trial.  Lewis Sellars, a supervisory auditor with the United States Attorney's Office Economic and Environmental Crime Center, testified that a signature on a check used in the cash-to-close portion of the fraudulent scheme was Michael's.  Essentially, Michael argues that this "summary witness for monetary transactions gave opinion evidence that a signature was [Michael's] without being qualified as an expert in that area; and admission of the testimony, at the very least, was speculative and should have been excluded pursuant to" Federal Rule of Evidence 403.  Br. of Appellant M.R. at 60.  Michael did not object to this testimony at trial,[5] so we review this claim for plain error. *See Edouard*, 485 F.3d at 1343 ("[W]here . . . the defendant failed to preserve his

---

[5] Michael moved for a mistrial after Sellars's testimony, but he argued only that there was insufficient evidence to connect him to the forgery of a check—he did not challenge Sellars's qualification to identify his signature.  And, in moving for a mistrial, Michael's counsel appeared to concede that Michael had signed the check in question.

challenge to an evidentiary ruling by contemporaneously objecting, our review is for plain error.").

To establish plain error, Michael must show "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Shelton*, 400 F.3d 1325, 1328–29 (11th Cir. 2005) (quotation omitted). "If all three conditions are met, [we] may then exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1329 (quotation omitted). Even if we assume that this testimony was admitted in error, that error did not affect Michael's substantial rights. Michael had an opportunity to cross-examine Sellars, and he later called Sellers as a surrebuttal witness to challenge his identification of Michael's signature. In addition, the jury could easily compare Michael's signature on the check in question to his signature on numerous other exhibits, many of which he admitted to signing.

## VI

Next we'll discuss Barbara's contention that the district court abused its discretion by failing to deny the government's motion *in limine* aimed at excluding good-conduct evidence—specifically, as Barbara describes it, "evidence of legitimate loans which would have established a pattern of conduct . . . reflecting that she merely signed checks to close and was not involved in the actual closings

15

and/or the preparation or signing of closing documents." Br. of Appellant B.R. at 19. The government objected to Barbara's potential defense, but the district court deferred ruling on its motion, stating that it would "[d]ecide it when the issue [wa]s brought up" during the trial.

Barbara does not appear to have ever attempted to introduce any good-conduct evidence at trial, nor does she reference any such evidence that the district court excluded. Thus, the district court didn't—couldn't, really—err, as no opportunity arose for it to rule on this motion.

## VII

Finally, Michael and Barbara challenge the substantive reasonableness of their sentences of 136 months and 114 months, respectively, arguing that their sentences were disproportionate to the sentences of both their co-defendants and of other similarly situated defendants. Although the Rojases' recommended Guidelines ranges were between 188–235 months' imprisonment, the district court granted them downward variances.

We evaluate the substantive reasonableness of a sentence based on the 18 U.S.C. § 3553(a) factors and "the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007). "A district court abuses its considerable discretion and imposes a substantively unreasonable sentence only when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives

16

significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015) (quotation omitted).  As a result, "it is only the rare sentence that will be substantively unreasonable," *id.* (quotation omitted), and we usually "expect a sentence within the Guidelines range to be reasonable," *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (quotation omitted). Additionally, "[d]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *United States v. Regueiro*, 240 F.3d 1321, 1325–26 (11th Cir. 2001).  In particular "there is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial." *United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (quotation omitted).

The Rojases' sentences—although admittedly lengthy—were not substantively unreasonable.  The sentences imposed were *below* the recommended Guidelines range, and their co-defendants pleaded guilty in lieu of proceeding to trial.  The district court did not abuse its discretion here.

**AFFIRMED.**

17