[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13965
_____

D.C. Docket No. 1:11-cr-20100-PAS-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VANJA ABREU, Ph.D.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 1, 2020)

Before JORDAN, NEWSOM, and HALL,* Circuit Judges.

JORDAN, Circuit Judge:

The American criminal justice system, despite its protections for the accused, "has been always haunted by the ghost of the innocent [person] convicted." *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y. 1923) (L. Hand, J.). In 1938, to provide a financial remedy for innocent persons who are wrongfully convicted in federal courts, Congress enacted the Unjust Conviction Statute. *See* Pub. L. No. 75-539, 52 Stat. 438 ("An Act To grant relief to persons erroneously convicted in courts of the United States"), now codified at 28 U.S.C. §§ 1495, 2513. Briefly stated, a person who obtains a certificate of innocence under § 2513 can seek damages from the United States in the Court of Federal Claims pursuant to § 1495. *See* § 2513(e) (authorizing a wrongfully convicted person to receive up to $50,000 for every 12 months of incarceration).

A jury found Vanja Abreu, Ph.D., guilty of conspiracy to commit healthcare fraud. *See* 18 U.S.C. § 1349. She served three years in prison before we overturned her conviction on direct appeal due to insufficiency of the evidence. *See United States v. Willner*, 795 F.3d 1297, 1301 (11th Cir. 2015).

---

* Honorable James Randal Hall, Chief United States District Judge for the Southern District of Georgia, sitting by designation.

2

Following our ruling, Dr. Abreu petitioned the district court for a certificate of innocence, seeking to obtain compensation for the time she spent incarcerated. In support of her petition, she submitted only a copy of our decision in *Willner*. The district court denied the petition, concluding that she failed to carry her burden of demonstrating innocence under § 2513.

We now affirm. Our opinion in *Willner*, though concluding that the evidence was insufficient to prove guilt beyond a reasonable doubt, did not by itself establish Dr. Abreu's innocence under § 2315. And given that Dr. Abreu did not submit any other evidence supporting her claim of innocence, the district court did not err in denying her petition.

## I

In 2011, a federal grand jury in the Southern District of Florida indicted 20 persons for numerous offenses related to a fraudulent $200 million Medicare scheme. The defendants—including Dr. Abreu—were employees of or contractors for American Therapeutic Corporation, a community health center that operated "partial hospitalization programs" throughout South Florida for mentally ill patients covered by Medicare.

The 38-count indictment alleged that the defendants conspired to submit false claims to Medicare for mental health services that were medically unnecessary or not provided at all. According to the indictment, some of the defendants paid

3

kickbacks to patient brokers, halfway houses, or assisted living facilities in exchange for delivering patients to American Therapeutic. Others were accused of running a complex scheme to launder cash for the kickbacks.

The indictment charged Dr. Abreu only in Count 1, which alleged a conspiracy to defraud Medicare in violation of 18 U.S.C. § 1349. The sole factual allegation in the indictment about her role in the conspiracy—contained in the "manner and means" section—was that she (and others) "cause[d] the alteration of patient files, as well as therapist notes maintained in [American Therapeutic's] computer system, for the purpose of making it falsely appear that patients being treated by [American Therapeutic] qualified for [partial hospitalization program] services." D.E. 26 at ¶ 10.

## A

Dr. Abreu proceeded to trial with six codefendants. The government established that she worked at American Therapeutic for several years as a program director. In that position, she managed both the clinical and operational sides of the health centers, and her duties included Medicare protocol and compliance. She was eventually promoted to corporate director and took on additional responsibilities. For example, she supervised the program directors, trained clinicians on Medicare, and conducted mock audits to ensure that charts and documents complied with Medicare.

4

Witnesses testified that American Therapeutic and its brick-and-mortar locations were nothing more than a Potemkin village—most of its patients, the witnesses explained, were not eligible for the partial hospitalization treatments they were receiving.  Patients were cycled in and out based on whether Medicare would cover their stays, and not on their medical needs.  In order to further the vast and fraudulent scheme, doctors signed charts and forms for patients whom they did not examine or who were already discharged, and other conspirators falsified charts to make patients look eligible for covered treatments.

The government called several witnesses to implicate Dr. Abreu in the Medicare fraud conspiracy.  In setting out some of their testimony below, we do not assess its collective weight or determine its overall credibility.  We also do not state as "fact" what Dr. Abreu did or did not do.  We only observe that witnesses and coconspirators—including leaders of the scheme—testified against Dr. Abreu and offered some circumstantial evidence of her involvement.

Marianella Valera, for example, was at the helm of the conspiracy as one of three owners of American Therapeutic.  She and Dr. Abreu helped doctors and therapists get "up to date" on deficient patient charts (i.e., psychiatric evaluations, progress notes, and discharge summaries).  Sometimes they updated charts for patients who were already discharged, and sometimes they completed charts on behalf of therapists who were no longer working for American Therapeutic.  Ms.

5

Valera explained that the two worked side by side, and that she once instructed Dr. Abreu, "[i]f you don't know the patient, you have to read about the patient in order to create a document." If the charts all looked the same, Ms. Valera explained, it would trigger Medicare scrutiny. Dr. Abreu "was taking care of" that problem.

The government introduced emails to and from Dr. Abreu and Ms. Valera, and others. In one of those emails, Dr. Abreu wrote that certain patient documents did "not look fit for inspection." She added that "[t]oday I will be working on doctors' orders since Graciela did not come in[.]" Ms. Valera identified Graciela as the nurse in charge of typing up the doctors' orders, and explained that she understood from the email that Dr. Abreu would type up the orders herself.

Ms. Valera also testified that she forged doctors' signatures on patient charts and believed that Dr. Abreu knew about the forgeries. Ms. Valera explained that Dr. Abreu would bring her charts with red flags (indicating they were not yet signed by doctors), leave them in a room with her alone, and then return a few minutes later to pick them up without the red flags, fully signed for filing.

According to Ms. Valera, she discussed patient admissions with Dr. Abreu. She instructed Dr. Abreu on how to deal with patients who were of "questionable" eligibility because, for example, they had dementia, were elderly, or their condition otherwise "wasn't too severe." Ms. Valera maintained that she instructed Dr. Abreu to admit those patients only for short stays covered by Medicare.

6

Dr. Alan Gumer, a psychiatrist at American Therapeutic, pled guilty to the conspiracy charge and testified for the government. He related that Dr. Abreu brought him charts to sign for patients who had already been discharged. In a legitimate partial hospitalization program, he explained, a doctor would not sign a "closed chart." Dr. Gumer also testified that Dr. Abreu was in the room with him on a handful of occasions when he signed documents that someone else created, completed files for patients he had not seen, or filled in charts that were backdated.

Gwendolyn Gipson, a medical records clerk at one of the American Therapeutic sites, testified that Dr. Abreu was present at meetings in which therapists complained about inappropriate admissions and protested that they were risking their licenses. Ms. Gipson said that Dr. Abreu assured the therapists that they were not at risk so long as they serviced the patients on site and made sure their documents were Medicare-compliant.

Margarita Acevedo was hired to work in "marketing" for American Therapeutic, but in reality she recruited patients for cash and eventually ran the entire kickback operation. Ms. Acevedo testified that she had discussions with Dr. Abreu about how to bring in new patients, "not the same ones over and over again," and that they "needed to visit new homes [presumably, assisted living facilities] and bring in new patients."

7

Joseph Valdes, who was also responsible for recruiting patients and paying kickbacks, worked under Ms. Acevedo. He testified that he shared an office with Dr. Abreu and witnessed her editing patient files that had already been filled out by doctors. He understood that she was making those changes "[t]o keep the story . . . just in case that there was ever an audit."

Dr. Abreu's attorney, Charles White, cross-examined these witnesses and others, and he elicited some testimony that tended to undermine their credibility or distance Dr. Abreu from the charged conspiracy. Dr. Abreu did not submit any of this evidence in the district court, and she does not rely on it on appeal. But because we have summarized some of the evidence against her at trial, we point out the favorable testimony for completeness.

Mr. White, for example, had a few witnesses acknowledge that, because of her duties, Dr. Abreu was often at family court or other outside locations. This tended to show that she was not always present at the American Therapeutic facilities where the scheme was taking place.

Regarding the implication that Dr. Abreu facilitated the admission of ineligible patients, Mr. White prompted Ms. Valera to explain that admissions decisions in the mental health context involve difficult and subjective interpretations of symptoms, at least more so than with purely physical ailments. Ms. Valera conceded that some of the patients had legitimate psychiatric symptoms, but she also

8

testified that it was obvious to her that several patients did not have acute symptoms requiring Medicare-covered services.

Perhaps most importantly, Ms. Valera admitted on cross-examination that she had "betrayed" Dr. Abreu, although she clarified on redirect that she did not believe Dr. Abreu was fooled by what was going on. She also admitted that she never forged doctor signatures right in front of Dr. Abreu, but she explained on redirect that the doctors whose signatures she forged were not in the building when Dr. Abreu dropped off and picked up the files. Mr. White also elicited testimony from Ms. Acevedo that she never directly informed Dr. Abreu that she and others were paying illegal kickbacks for patients.

Dr. Abreu did not take the stand to testify in her own defense. She called two witnesses on her behalf, but neither had personal knowledge about her work at American Therapeutic, and therefore could not exonerate her.[1]

At the close of evidence, Dr. Abreu renewed her motion for a judgment of acquittal, which the district court had initially taken under advisement. The court

---

[1] The first witness was an attorney from the Dominican Republic. He testified that he encouraged Dr. Abreu to fly back to the United States and hire an American defense lawyer after she was indicted. He admitted that he had no information or personal knowledge about her work at American Therapeutic. The second witness was a private investigator who had visited an American Therapeutic facility after it had been closed down and filmed his walk-through of the building. He testified about the film and its contents but said nothing about Dr. Abreu's conduct.

9

denied the motion, however, and the jury found Dr. Abreu guilty as charged. She served three years of a nine-year prison sentence.

**B**

In *Willner*, 795 F.3d at 1301, we reversed Dr. Abreu's conviction because the government presented insufficient evidence to prove guilt beyond a reasonable doubt. As Dr. Abreu had been charged with conspiracy to defraud Medicare, the government had to prove that she knew the unlawful purpose of the conspiracy and that she knowingly and willfully joined it. *See id.* at 1306. We observed that the government did not offer direct evidence on these two elements. "No witness testified that Dr. Abreu joined the conspiracy [and] [t]here [were] no documents in the record that Dr. Abreu allegedly falsified." *Id.* at 1307.

The government sought to defend the conviction based on circumstantial evidence, arguing that the jury could have inferred from testimony (some of which we summarized above) that Dr. Abreu knew patients were ineligible for Medicare-covered services and falsified charts to make them appear eligible. But we rejected the government's argument, and held that the circumstantial evidence was still insufficient to convict. *See id.* at 1307–09.

As part of her job, Dr. Abreu "altered and completed patient files to make them Medicare-compliant." *Id.* at 1308. But the fact that she "altered and completed" such documents did not prove that her alterations were false or

10

fraudulent, or performed with the intent to advance the conspiracy. *See id.* With respect to the red-flagged charts, for example, we acknowledged Ms. Valera's testimony. But we concluded that this did not prove that Dr. Abreu knew that Ms. Valera was forging signatures. And "[e]ven if Dr. Abreu drew that inference, the [g]overnment direct[ed] us to no evidence that Dr. Abreu knew why [Ms. Valera] had done so or whether the information in the charts was false." *Id.* at 1308.

We also considered the evidence that Dr. Abreu and Ms. Valera had discussed admitting patients of questionable eligibility, and that the two deliberated on whether to keep those patients for the "short stays" covered by Medicare. *See id.* at 1309. In our view, this testimony indicated that "Dr. Abreu might have made poor admission decisions on occasion," but we concluded that the government failed to "tie this evidence to [her] alleged role in the conspiracy." *Id.*

## C

After we issued *Willner*, and following her release from custody, Dr. Abreu petitioned the district court for a certificate of innocence under 28 U.S.C § 2513. She did not submit any evidence along with her petition. She attached only our opinion in *Willner* and a proposed order. *See* D.E. 1790. She also did not request an evidentiary hearing, although she did eventually seek a hearing to resolve issues of law—to "clarify the [Unjust Conviction Statute] and its specific requirements,"

11

given "the disagreement between the parties as to the applicable statutory standard[.]" D.E. 1796 at 11.

Dr. Abreu argued in her petition that *Willner* established three things: (1) that there was no direct or circumstantial evidence against her with respect to the charged conspiracy; (2) that she lacked the requisite knowing and willful intent to conspire to defraud Medicare; and (3) that she committed no criminal acts. *See* D.E. 1790 at 3, 10–14. She also maintained that she satisfied the other elements of § 2315 because her conviction was overturned for insufficient evidence and because she did not bring about her own prosecution by misconduct or neglect. *See id.* at 8–9, 14–15.

The government opposed the petition. It argued that our opinion in *Willner* did not entitle Dr. Abreu to a certificate of innocence, and that, in any event, she was not actually innocent under § 2513 because she did not provide any affirmative evidence showing that she was. *See* D.E. 1793 at 10–13.

The district court denied the petition. Applying a preponderance of the evidence standard, *see* D.E. 1800 at 8, it concluded that Dr. Abreu failed to carry her burden, and it rejected her argument that *Willner* established her actual innocence. "Nowhere in the [Eleventh Circuit's] lengthy and detailed analysis regarding the insufficiency of the evidence, [did] the Court go so far as to find [Dr. Abreu] actually innocent of the crime." *Id.* at 10.

12

According to the district court, some circumstantial evidence at trial pointed toward her guilt, even though that evidence was not strong enough to prove guilt beyond a reasonable doubt.  Given her substantial role in American Therapeutic and her responsibility for Medicare-related documents, the court was not convinced that Dr. Abreu was truly innocent.  *See id.* at 10–12.

## II

A person who is accused of a crime is entitled to a presumption of innocence. That presumption "is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."  *Coffin v. United States*, 156 U.S. 432, 453 (1895).  The prosecution must overcome that presumption and prove guilt beyond a reasonable doubt.  *See In re Winship*, 397 U.S. 358, 364 (1970).[2]

When a person returns to court to petition for a certificate of innocence under the Unjust Conviction Statute, she is no longer on trial accused of a crime.  She "is now the plaintiff in civil litigation, so the burdens of production and persuasion are h[ers]."  *Pulungan v. United States*, 722 F.3d 983, 986 (7th Cir. 2013).  *See also*

---

[2] For different historical perspectives on the origins of the beyond reasonable doubt standard, compare, e.g., Barbara Shapiro, *Changing Language, Unchanging Standard: From 'Satisfied Conscience' to 'Moral Certainty' to 'Beyond Reasonable Doubt,'* 17 Cardozo J. Int'l & Comp. L. 261, 279 (2009) (asserting that the development of the beyond reasonable doubt standard "points to a continued effort to hold juries to the highest standard possible for day-to-day human affairs"), with, e.g., James Q. Whitman, The Origins of Reasonable Doubt: Theological Roots of the Criminal Trial 3 (2008) ("Strange as it may sound, the reasonable doubt formula was originally concerned with protecting the souls of *the jurors* against damnation.").

*United States v. Keegan*, 71 F. Supp. 623, 636 (S.D.N.Y. 1947) (the petitioner is "the moving party, who asks the court to find and certify a fact"). Before addressing the merits of Dr. Abreu's appeal, we discuss some preliminary procedural issues

## A

Those circuits which have directly faced the question have held that the preponderance of the evidence standard governs in § 2513 proceedings. *See United States v. Grubbs*, 773 F.3d 726, 733 (6th Cir. 2014); *Abu-Shawish v. United States*, 898 F.3d 726, 739 (7th Cir. 2018); *Holmes v. United States*, 898 F.3d 785,789 (8th Cir. 2018). We agree. A proceeding pursuant to § 2513 is civil in nature, *see Holmes*, 898 F.3d at 789, and preponderance of the evidence is the default standard in civil actions between private parties (unless particularly important individual interests or rights are at stake). *See Grogan v. Garner*, 489 U.S. 279, 286 (1991). We recognize, of course, that here one of the parties is the United States, but the statutory "silence [on the applicable standard of proof] is inconsistent with the view that Congress intended to require a special, heightened burden of proof." *Id.*[3]

Under § 2513(a), therefore, Dr. Abreu had to "allege and prove" three things by a preponderance of the evidence to obtain a certificate of innocence.

---

[3] The Fourth Circuit, without expressly addressing the appropriate evidentiary standard, has said that a § 2513 petitioner has a "rigorous burden." *United States v. Graham*, 608 F.3d 164, 172 (4th Cir. 2010). In evidentiary terms, we do not know what a "rigorous burden" is supposed to entail, so we adopt the familiar preponderance of the evidence standard.

14

Understanding that "innocence" is a term of art with a particular definition for purposes of § 2513, we set out the statutory text in the accompanying footnote, and summarize its requirements below.[4]

First, Dr. Abreu had to establish that her conviction was reversed "on the ground that [s]he is not guilty of the offense for which [s]he was convicted." § 2513(a)(1). Our decision in *Willner* satisfies the first alternative prong of this element, *see Pulungan*, 722 F.3d at 986, and the government concedes as much. So we do not discuss this requirement further.

Second, Dr. Abreu had to prove her innocence. She could have done this by showing either that she "did not commit any of the acts charged" *or* that "those acts or related acts constituted no crime against the United States, or any State, Territory or the District of Columbia." § 2513(a)(2). *See Osborn v. United States*, 322 F.2d 835, 841 (5th Cir. 1963) ("[T]he 'or' in the statute means that [the petitioner] may

---

[4] In full, § 2513 reads as follows:

(a) Any person suing under section 1495 of this title must allege and prove that:

(1) His conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing he was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction and

(2) He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution.

(b) Proof of the requisite facts shall be by a certificate of the court or pardon wherein such facts are alleged to appear, and other evidence thereof shall not be received.

15

prove either; he does not have to prove both."). This is the element we focus on in the rest of the opinion.

Third, Dr. Abreu had to demonstrate that she "did not by misconduct or neglect, cause or bring about h[er] own prosecution." § 2513(a)(2). The parties dispute whether the district court reached this issue, but we need not address the matter because we conclude that the second element is dispositive.

**B**

That leaves one last procedural issue—the appropriate standard of appellate review of a § 2513 order. Our only decision applying the Unjust Conviction Statute, issued more than 50 years ago, did not directly address this question. *See Osborn*, 322 F.2d at 842–43. Our sister circuits have generally held that appellate review in this context is for abuse of discretion. *See Rigsbee v. United States*, 204 F.2d 70, 72–73 & n.3 (D.C. Cir. 1953); *Graham*, 608 F.3d at 172; *Grubbs*, 773 F.3d at 731; *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993); *United States v. Racing Services, Inc.*, 580 F.3d 710, 713 (8th Cir. 2009). *Cf. Hernandez v. United States*, 888 F.3d 219, 222 (5th Cir. 2018) (declining to adopt a standard of review because the petitioner's claim failed under a *de novo* standard, but acknowledging that all other circuits to address the issue have adopted an abuse of discretion standard).

In some cases, such as when the district court is only engaged in historical fact-finding, there is an argument that review of an innocence determination under

16

§ 2513 should be for clear error.  But it may be that the abuse of discretion standard is flexible enough to include this type of review.  *See, e.g., United States v. Irey*, 612 F.3d 1160, 1246 (11th Cir. 2010) (en banc) (Tjoflat, J., concurring in part) ("[A] district court can abuse its discretion by making a clearly erroneous factfinding.").  On the other hand, we recognize that in other contexts the matter of innocence is not always purely factual, and that a plenary standard of review may sometimes be appropriate.  For example, "actual innocence" is a means by which a habeas corpus petitioner can have a procedurally defaulted claim heard on the merits by a federal court.  And the Supreme Court has held such "actual innocence" determinations— in part because they are based on a "predictive standard regarding whether reasonable jurors would have reasonable doubt"—are not subject to clear error review.  *See House v. Bell*, 547 U.S. 518, 539–40 (2006).

We leave a definitive ruling on the proper standard of appellate review under § 2513 for another day.  Dr. Abreu does not argue for a standard other than abuse of discretion, and in the absence of adversarial briefing on the matter we will use that standard.  *See generally McLane Co., Inc. v. E.E.O.C.*, 137 S. Ct. 1159, 1169 (2017) (explaining that abuse of discretion review gives the decisionmaker a "'wide range of a choice'" and serves to provide a certain amount of insulation from appellate review "for functional reasons") (citation omitted).

17

## III

Under § 2513(a), Dr. Abreu had two ways of establishing her innocence. She could show that she "did not commit any of the acts charged," *or* she could show that "those acts or related acts constituted no crime against the United States, or any State, Territory or the District of Columbia." § 2513(a)(2). *See Osborn*, 322 F.2d at 841. On appeal she focuses exclusively on the first avenue for satisfying § 2513(a)(2).

## A

Dr. Abreu was charged with conspiring, in violation of 18 U.S.C. § 1349, to commit healthcare fraud in violation of 18 U.S.C. § 1347. A § 1349 conspiracy does not require an overt act. *See United States v. Gonzalez*, 834 F.3d 1206, 1220 (11th Cir. 2016). So the matter of guilt at trial depended on whether the government could prove beyond a reasonable doubt that Dr. Abreu knew the unlawful purpose of the healthcare fraud conspiracy and that she knowingly and willfully joined it. *See Willner*, 795 F.3d at 1306. *Cf. United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) ("Because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements.") (internal quotation marks and citation omitted).

In her brief, Dr. Abreu relies exclusively on *Willner*, but a reversal of a conviction due to insufficient evidence does not automatically entitle a petitioner to

a certificate of innocence under § 2513(a)(2).  "A conclusion that the prosecutor did not prove a charge beyond a reasonable doubt differs from a conclusion that the defendant is innocent in fact."  *Pulungan*, 722 F.3d at 985.  *See also Grubbs*, 773 F.3d at 733 ("In light of the civil nature of proceedings for a certificate of innocence and the resulting shifts in the burdens and standards of proof from a criminal proceeding, an appellate decision reversing a petitioner's conviction will not in all cases control the question of innocence."); *Abu-Shawish*, 898 F.3d at 739 ("Whether the evidence was sufficient to support a finding of guilt is not the test for a certificate of innocence.").[5]

We reject Dr. Abreu's argument that the district court ignored and/or misapplied the preponderance of the evidence standard and improperly imposed a higher evidentiary burden.  First, the district court expressly recognized that Dr. Abreu's burden under § 2513 was to establish innocence by a preponderance of the evidence.  *See* D.E. 1800 at 8.  Second, although the district court stated that there was "room for the possibility that [Dr. Abreu] committed the crime," *id.* at 10, we

---

[5] The same is true of a jury acquittal. *See Rigsbee*, 204 F.2d at 72 ("We . . . reject . . . the appellant's contention that a verdict of not guilty at his second trial makes it mandatory, as a matter of law, that the trial judge execute a certificate of innocence[.]"). "In effect," the Unjust Conviction Statute "requires that an expert thirteenth juror concurs in the verdict of not guilty." *Id. Cf. United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984) ("[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt[.]"); 2A Peter J. Henning & Sarah N. Welling, Federal Practice and Procedure: Criminal § 468 (4th ed. 2020) ("Because different standards of proof are involved, acquittal in the criminal action does not bar a civil suit based on the same facts.").

19

read that language as confirming what we recognized above—that a reversal of a conviction for insufficient evidence does not automatically entitle a person to a certificate of innocence.  *See, e.g., Pulungan*, 722 F.3d at 985.

**B**

According to Dr. Abreu, we held in *Willner* that the government introduced "no evidence whatsoever against [her] to establish her knowledge of or participation in the conspiracy," and that she is therefore more likely than not innocent of the charge against her.  *See* Appellant's Br. at 6.  In our view, Dr. Abreu reads *Willner* too broadly.  Assuming without deciding that an appellate decision reversing a conviction for insufficient evidence can by itself entitle a person to certificate of innocence, *Willner* is not such a decision.[6]

It is true, as Dr. Abreu points out, that we frequently used the phrase "no evidence" in *Willner*.  But taken in context, this was shorthand for no *direct* evidence or no circumstantial evidence *from which the jury could find guilt beyond a reasonable doubt*.  Indeed, as we explain below, there was some incriminating

---

[6] Judge Newsom would resolve this case based on a categorical rule that "a § 2513 petitioner can never obtain a certificate of innocence by relying exclusively on an appellate court's decision reversing her conviction for insufficient evidence."  Concurring Op. at 5.  In our view, it is better to decide the case on narrower grounds, based on the particular facts before us.  *See City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010) ("A broad holding . . . might have implications for future cases that cannot be predicted.  It is preferable to dispose of this case on narrower grounds."); *Harbourside Place, LLC v. Town of Jupiter, Fla.*, 958 F.3d 1308, 1322 (11th Cir. 2020) ("[T]his is a good opportunity for us to practice judicial minimalism, and decide no more than what is necessary to resolve [the case].").

20

evidence against Dr. Abreu at trial.  That evidence may have been circumstantial, and in the end was too weak to prove guilt beyond a reasonable doubt, but it was probative of guilt nonetheless.

Dr. Abreu worked at American Therapeutic, which was the hub of the healthcare fraud scheme.  She was in charge of Medicare compliance, and in that role she had access to patient files and supervised all program directors in the eight offices.  The government presented evidence at trial that she altered patient files at a time when the coconspirators were defrauding Medicare by making ineligible patients appear eligible for Medicare-covered services.  *See Willner*, 795 F.3d at 1308.  As the district court summarized, the evidence at trial showed that she wrote notes for patients who were no longer at American Therapeutic, updated or corrected notes for therapists no longer employed by the company, and wrote psychiatric evaluations, progress notes, and discharge summaries for doctors who were deficient in their paperwork, and sometimes did so without having met the patients in question.  *See* D.E. 1800 at 5–6.

Given that the alteration of patient files was an act alleged in the indictment, it is difficult to see how *Willner* demonstrates that Dr. Abreu did not "commit any of the acts charged."  § 2513(a)(2).  The evidence at trial, though not establishing her guilt beyond a reasonable doubt, pointed in that direction, and permitted the district court to conclude that she had not satisfied her burden: "[T]he distinction

21

between 'falsifying' and 'altering' is too razor-thin" to demonstrate innocence, because the "success of the conspiracy depended on maintaining paperwork to ensure payments from Medicare—for services that were either never rendered, and if they were, for patients who were not qualified for such services—for which [Dr. Abreu] was responsible." D.E. 1800 at 11. *Cf. United States v. Mahmud*, 541 F. App'x 630, 635 (6th Cir. 2013) (evidence that the defendant directed others "to alter dates in patient files to maximize the amount that could be billed to [M]edicare" constituted circumstantial proof that he know of an ongoing Medicare fraud).[7]

Dr. Abreu argues, however, that we found in *Willner* that she "only 'altered' patient files as part of her legitimate job responsibilities," and that the district court erred in not abiding by this finding. *See* Appellant's Br. at 34–35. The relevant statements in *Willner* were, first, that "[t]here is evidence that, as part of her job, Dr. Abreu altered and completed patient files to make them Medicare-compliant," and, second, that "[n]o reasonable juror could find beyond a reasonable doubt that Dr. Abreu falsified charts[.]" 795 F.3d at 1307–08. Neither of those two statements

---

[7] This case is therefore much different than *Jones v. United States*, 2011 U.S. Dist. LEXIS 51029 (E.D. Mo. May 12, 2011), on which Dr. Abreu relies in her reply brief. There the petitioner had been convicted of drug trafficking, but the *only* evidence against him was the testimony of a corrupt police officer. *See id.* at *1. The government did not stand by the officer's testimony and it joined the petitioner's motion to vacate his conviction and sentence. The district court held that the petitioner was actually innocent because, when the officer's non-credible testimony was "stripped away," all that remained was the evidence of the petitioner's presence at the apartment, which "was not a crime." *Id.* at *5–6.

22

were findings of fact; nor did they foreclose the possibility that Dr. Abreu used her legitimate job responsibilities to access, alter, *and* falsify the documents.

In other words, what we explained in *Willner* is that altering Medicare-related documents, without proof that the alterations were false, does not demonstrate participation in a healthcare fraud conspiracy beyond a reasonable doubt. But alteration of patient files is not necessarily innocent either, particularly when done in the midst of an ongoing conspiracy to commit Medicare fraud. So, the question is what exactly did Dr. Abreu alter in the patient charts, and why? The government did not fill in the missing pieces of the puzzle at trial, and therefore failed to prove that when she altered the charts, she falsified them with full knowledge of and as part of the conspiracy. Dr. Abreu, for her part, has never in these § 2513 proceedings denied altering patient files. Nor has she explained why she was permitted or required, as part of her job duties, to alter those files. If there was an innocent explanation for her actions, she did not present it below and she has not offered it on appeal. *See Osborn*, 322 F.2d at 842 (where there was "no evidence" that he "did not kill his fellow prisoner in concert with others as charged," the petitioner "failed to satisfy the first alternative condition for recovery").[8]

---

[8] Dr. Abreu's reliance on *Betts*, 10 F.3d at 1281, is misplaced. In that case, the appellate reversal of the petitioner's conviction was based on legal impossibility, and the petitioner sought to prove actual innocence through the second avenue of § 2513(a)(2). *Willner* does not say or hold that it was legally impossible for Dr. Abreu to have been guilty of the conspiracy to commit Medicare fraud, and she seeks to prove innocence through the first avenue of § 2513(a)(2).

## C

Dr. Abreu mentions in passing in her initial brief that "the district court did not grant her request for a hearing where these issues could have been discussed in more detail," and says that she "would be willing to testify" should the district court want to hear from her. *See* Appellant's Br. at 33. The Seventh Circuit has held that, although the procedures for ancillary civil proceedings under the Unjust Conviction Statute are within the discretion of the district court, the court must at least give the petitioner the opportunity to be heard. *See Abu-Shawish*, 898 F.3d at 737 (remanding for an evidentiary hearing because the "petition was dismissed without any response from the government, without any briefing or hearing, and by imposing a pleading standard not compatible with civil proceedings and without an opportunity to try to cure the pleading defects identified by the district court").

Yet Dr. Abreu does not develop this argument in her brief. She does not claim that the district court denied her the opportunity to present evidence, nor does she contend that any of its procedures constituted reversible error. In any event, Dr. Abreu did not request an evidentiary hearing below, and did not ask for leave to submit evidence (e.g., her own affidavit) when she received the government's response. Because Dr. Abreu did not preserve the procedural argument below, and because she does not develop it on appeal, we deem it abandoned. *See Blue Martini Kendall, LLC v. Miami Dade Cty. Fla.*, 816 F.3d 1343, 1349 (11th Cir. 2016)

24

(explaining that we ordinarily refrain from considering issues raised for the first time on appeal); *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (deeming an issue abandoned because there was only a passing reference to the alleged error in the brief).

## III

Dr. Abreu is undoubtedly a sympathetic petitioner. She spent three years in prison even though the government was not able to prove her guilt beyond a reasonable doubt. But Congress did not enact a law that provides a monetary remedy to every person whose conviction has been reversed on appeal. As we explained in *Osborn*, "[t]he legislative history indicates that Congress carefully limited availability of the Unjust Conviction Statute to those who are truly innocent." 322 F.2d at 840.

The Unjust Conviction Statute therefore required Dr. Abreu to allege and prove her actual innocence, even though she is innocent in the eyes of society. She chose to base her request for a certificate of innocence solely on our decision in *Willner*, but as we have explained, that decision did not by itself establish her innocence under § 2513(a)(2). Given that Dr. Abreu failed to present any affirmative evidence of her innocence, the district court did not abuse its discretion in concluding that she did not satisfy her burden of proof.

**AFFIRMED.**

25

NEWSOM, Circuit Judge, concurring in the judgment:

I agree with my colleagues that the district court didn't abuse its discretion in refusing Dr. Abreu's petition for a certificate of innocence, which (as relevant here) required her to "allege and prove," among other things, that "[s]he did not commit any of the acts charged." 28 U.S.C. § 2513(a)(2). I reach that conclusion, though, by a slightly different route. The majority opinion "assum[es] without deciding that an appellate decision reversing a conviction for insufficient evidence can *by itself* entitle a person to a certificate of innocence" under § 2513—and then goes on to conclude, on the particulars of this case, that our earlier decision reversing Dr. Abreu's conviction doesn't do the trick. Maj. Op. at 20 (emphasis added). I disagree with the majority's assumption. In my view, an appellate court's decision reversing a criminal defendant's conviction on the ground that there is insufficient evidence to support it—no matter what the court's accompanying opinion says—can never alone entitle a petitioner to a certificate of innocence. Let me explain.

To recap briefly, after Dr. Abreu was convicted of conspiring to defraud Medicare in violation of 18 U.S.C. § 1349, she appealed to this Court. *See United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015). In particular, Dr. Abreu argued in that case that "there was insufficient evidence from which any reasonable juror

26

could find that [she] was guilty beyond a reasonable doubt of knowing that a criminal conspiracy existed and of willfully joining it." *Id*. at 1306.  We thus framed the sufficiency-of-the-evidence question before us as follows: "We resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict and ask whether any reasonable juror could have found Dr. Abreu guilty beyond a reasonable doubt." *Id*. at 1307.  Having scoured the record, and concluded that Dr. Abreu was right, we reversed her conviction.  *See id*. at 1309–10.

As a prelude to a civil damages action for wrongful conviction, Dr. Abreu then sought a certificate of innocence under § 2513, relying exclusively on our decision in *Willner*.  All here now seem to agree that our *judgment* in Dr. Abreu's direct appeal—that the government hadn't presented sufficient evidence to sustain a conspiracy conviction—does not alone entitle her to a certificate of innocence.  What makes this case interesting is that our accompanying *opinion* went farther, stating (repeatedly) that the record contained "no evidence" in support of key elements of the conspiracy charge.  *See, e.g.*, *id*. at 1307 ("no evidence"), 1308 ("[n]o evidence"), 1309 ("[n]o evidence"), 1310 ("no evidence").  That language, Dr. Abreu claims, makes *Willner* the rare appellate-court decision that, in and of itself, warrants a § 2513 certificate.  The majority's response here is to say that the phrase "no evidence" was just a "shorthand" for the *Willner* panel's determination that there was "no *direct* evidence or no circumstantial evidence *from which the*

*jury could find guilt beyond a reasonable doubt*." Maj. Op. at 20 (emphasis in original). And as a descriptive matter, I don't disagree with the majority's reading of *Willner*—it seems clear enough to me, as well, that all the panel there really meant was that the government hadn't introduced sufficient evidence to sustain Dr. Abreu's conviction.

For two reasons, though, I find it unnecessary to go down that road. The first pertains to what I'll call the philosophical "space" between the propositions (1) that there is *no* evidence of a criminal defendant's guilt and (2) that there *is* evidence of the defendant's innocence. The second pertains to the institutional authority—jurisdiction—of appellate courts in criminal cases.

As an initial matter, even read for all it's worth, *Willner* stands at most for the proposition that there was "no evidence" that Dr. Abreu was guilty of conspiring to defraud Medicare. 795 F.3d at 1307, 1308, 1309, 1301. The certificate-of-innocence statute demands more—as relevant here, it requires the petitioner to "allege and prove" that "[s]he did not commit any of the acts charged." The *absence* of evidence of a criminal defendant's *guilt* does not equate to the *presence* of evidence of that same defendant's *innocence*. The latter simply doesn't follow from the former—it just doesn't. And that is all the more true where, as here, the burden of proof has shifted—the government having borne it in the criminal prosecution, the petitioner shouldering it in the certificate-of-

28

innocence proceeding.  Even an aggressive reading of *Willner*, therefore, leaves a gap—space—that Dr. Abreu was obliged to fill if she intended to discharge her burden.  Because she didn't even try—say, by submitting an affidavit, or introducing new documentary evidence—her certificate-of-innocence claim necessarily fails.

Separately, and perhaps even more fundamentally, there is the matter of an appellate court's authority.  When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction on direct appeal, the sole question presented is (as it was in *Willner*) whether the government adduced adequate proof to support the jury's verdict.  And, correlatively, the most that the appellate court can do—legitimately, anyway—is reverse the defendant's conviction on the ground that there is insufficient evidence to sustain it.  The court has no charge—no jurisdiction—to go beyond that and make its own findings about the defendant's actual, factual innocence.  And to be clear, that holds no matter how broadly the court writes its accompanying opinion.  Imagine, for instance, a truly extreme case, in which an appellate court ventures its own impression that "Based on our review the evidence in the record, the defendant did not commit the crime with which she was charged."  However well-intentioned (and perhaps even accurate) that observation may be, it would in my view be *ultra vires*—an act of judicial overreach, not properly part of the court's judgment.

For me, then, it's as simple and syllogistic as this:  (1) As relevant here, § 2513 requires a certificate-of-innocence petitioner to "allege and prove" that "[s]he did not commit any of the acts charged"; (2) an appellate court reviewing the sufficiency of the evidence underlying a criminal defendant's conviction has no authority to determine that the defendant is actually innocent of the charged crime; and (3) accordingly, an appellate court's decision reversing a defendant's conviction for insufficient evidence, no matter how broadly written, can *never* alone entitle the former defendant to a § 2513 certificate of innocence.[1]

\* \* \*

For the foregoing reasons, I would hold that, as a matter of law, a § 2513 petitioner can never obtain a certificate of innocence by relying exclusively on an appellate court's decision reversing her conviction for insufficient evidence.  She must put on at least some proof of her own.  Because Dr. Abreu failed to do so here—preferring instead to travel under our *Willner* decision alone—her claim fails.

---

[1] As the majority opinion explains, Dr. Abreu proceeded exclusively under the first half of § 2513(a)(2)'s actual-innocence disjunction, which required her to demonstrate that "[s]he did not commit any of the acts charged."  *See* Maj. Op. at 17.  I leave for another day the question whether a petitioner might be entitled to a certificate of innocence based solely on an appellate court's reversal where the court's decision demonstrates, within the meaning of § 2513(a)(2)'s back half, that her conduct in connection with the charge "constituted no offense against the United States, or any State, Territory or the District of Columbia."

30